

FILED by MG   D.C.
ELECTRONIC

**April 11, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **08-20990 Civ-Seitz/O'Sullivan**

| | |
|---|---|
| DORIS STAEHR, Derivatively On Behalf of LENNAR CORPORATION, | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) |
| STUART A. MILLER, BRUCE E. GROSS, DIANE J. BESSETTE, DONNA E. SHALALA, STEVEN L. GERARD, IRVING BOLOTIN, JEFFREY SONNENFELD, SIDNEY LAPIDUS, R. KIRK LANDON, DAVID B. MCCAIN, CRAIG M. JOHNSON, HERVE RIPAULT, STEVEN J. SAIONTZ, | ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) ) |
| -and- | ) ) ) |
| LENNAR CORPORATION, a Delaware corporation, | ) ) ) |
| Nominal Defendant. | ) ) |

DEMAND FOR JURY TRIAL

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT**

**08-20990 Civ-**

Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Lennar Corporation ("Lennar" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of federal and state law, including violations of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, waste of corporate assets and unjust enrichment that occurred between September 2005 and the present (the "Relevant Period") and that have caused substantial monetary losses to Lennar and other damages, such as to its reputation and goodwill.

2.      Lennar is one of the nation's largest homebuilders.  It engages in the construction and sale of single-family attached and detached homes, and to a lesser extent multi-level residential buildings. The Company is also involved in the purchase, development and sale of residential land.

3.      During the Relevant Period, defendants caused or allowed Lennar to issue improper public statements, including improper press releases that misrepresented the Company's business health and prospects.  In particular, these statements said that Lennar's business model and strategy of investing in strategic locations and having "a balance sheet first approach to managing [Lennar's] operations" would help insulate the Company against a collapse in the housing market and give it a strategic advantage over other companies.

4.      The truth was, however, that even these "strategic markets" were vastly overbuilt. The Company, though, continued to build as quickly as possible contributing even more too oversaturated inventory levels.  When housing sales normalized and speculators left the market, the Company was left with a huge glut of unsold inventory.  Making matters even worse, the subprime credit crisis erupted causing people to cancel previously ordered homes, creating even more inventory.

5.     In order to sell homes, the Company had to drastically reduce the prices of houses and offer incentives to lure buyers.  These incentives and price moves drastically reduced the Company's margins.  Even worse, the housing demand refused to materialize, and inventory continued to rise faster than the Company could sell it.

6.     Due to the housing downturn, it became apparent that the Company did not adequately plan for a reduction in demand, that the Company was overexposed in markets with a glut of unsold houses and that the Company's business plan did not give it a strategic advantage over other companies during a downturn.

7.     As a result, the Company has lost money five of the past six fiscal quarters and in the past four consecutive quarters.  All told, the Company lost $2.293 billion in those quarters.

8.     When the truth of Lennar's business health was revealed, Lennar's market capitalization fell from a high of $10.46 billion to $2.06 billion, a drop of over 80%.

9.     While defendants were directing Lennar to issue improper statements concerning its exposure to the housing market crisis, they were also directing Lennar to repurchase over $365 million worth of its own shares at artificially inflated prices.  Even worse, certain of the defendants sold their personally held shares while in possession of material non-public information for over $15 million in proceeds.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. § 1331 because of claims arising under the Exchange Act. This Court also has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332(a)(2) in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

- 2 -

11.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because: (i) Lennar maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Lennar occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

13.     Plaintiff Doris Staehr is and was, at times relevant hereto, an owner and holder of Lennar stock. Plaintiff is a citizen of California.

14.     Nominal defendant Lennar is a Delaware corporation with its principal executive offices located at 700 Northwest 107th Ave, Miami, Florida. Lennar operates as a homebuilder in the United States. It engages in the construction and sale of single-family attached and detached homes, and to a lesser extent multi-level residential buildings. The Company is also involved in the purchase, development and sale of residential land. In addition, Lennar offers various financial services, including mortgage financing; title insurance; closing services; and ancillary services, such as high-speed Internet and cable television.

15.     Defendant Stuart A. Miller ("Miller") is Lennar's President and Chief Executive Officer ("CEO") and has been since April 1997. Miller is also a Lennar director and has been since April 1990. From 1997 to 2005, Miller was Chairman of the Board of LNR Property Corporation. Because of Miller's positions, Miller knew, consciously disregarded, or was

- 3 -

reckless in not knowing the adverse, non-public information about the business of Lennar including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors ("Board") meetings and committees thereof, as well as reports and other information provided to him in connection therewith.   During the Relevant Period, Miller participated in the issuance of improper statements, including the preparation of the improper press releases and Securities and Exchange Commission ("SEC") filings and approval of other statements made to the press, securities analysts and Lennar shareholders.  Defendant Miller received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2007 | $1,000,000 | - | $9,950,000 | - | $130,397 |
| 2006 | $1,000,000 | $4,713,200 | - | 200,000 | $7,700 |
| 2005 | $1,000,000 | $21,519,600 | $6,331,500 | 200,000 | $7,400 |
| 2004 | $1,000,000 | $15,190,700 | - | 400,000 | $7,500 |

During the Relevant Period, Miller sold 70,490 shares of Lennar stock for proceeds of $3,699,091.10. Defendant Miller is a citizen of Florida.

16.    Defendant Bruce E. Gross ("Gross") is Lennar's Vice President and Chief Financial Officer and has been since 1997.  Because of Gross' positions, Gross knew, consciously disregarded, or was reckless in not knowing the adverse, non-public information about the business of Lennar including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Gross participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lennar shareholders. Defendant Gross received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2007 | $650,000 | - | $4,975,000 | - | $55,850 |
| 2006 | $650,000 | $1,218,800 | | 50,000 | $7,700 |
| 2005 | $600,000 | $1,595,000 | $3,798,900 | 50,000 | $7,400 |
| 2004 | $550,000 | $1,320,000 | - | 100,000 | $7,500 |

During the Relevant Period, Gross sold 96,410 shares of Lennar stock for proceeds of $5,507,543.42. Defendant Gross is a citizen of Florida.

17.     Defendant Diane J. Bessette ("Bessette") is Lennar's Treasurer and has been since February 2008 and Vice President and has been since 2000. Bessette was also Lennar's Controller from 1997 to February 2008. Because of Bessette's positions, Bessette knew, consciously disregarded, or was reckless in not knowing the adverse, non-public information about the business of Lennar including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to her in connection therewith. During the Relevant Period, Bessette participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lennar shareholders. Defendant Bessette received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|---|
| 2007 | $350,000 | - | $2,487,500 | - | 150,000 | $31,850 |
| 2006 | $350,000 | $393,800 | | 30,000 | - | $7,700 |
| 2005 | $325,000 | $468,000 | $1,266,300 | 30,000 | - | $7,400 |
| 2004 | $300,000 | $360,000 | - | 60,000 | - | $7,400 |

During the Relevant Period, Bessette sold 33,167 shares of Lennar stock for proceeds of $1,706,304.98. Defendant Bessette is a citizen of Florida.

18.     Defendant Donna E. Shalala ("Shalala") is a Lennar director and has been since April 2001. Because of Shalala's position, Shalala knew, consciously disregarded or was reckless in not knowing the adverse, non-public information about the business of Lennar

- 5 -

Case 1:08-cv-20990-AJ   Document 1   Entered on FLSD Docket 04/11/2008   Page 7 of 55

including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to her in connection therewith. During the Relevant Period, Shalala participated in the issuance of improper statements, including the preparation of the improper press releases and other statements and approval of SEC filings made to the press, securities analysts and Lennar shareholders. During the Relevant Period, Shalala sold 2,500 shares of Lennar stock for proceeds of $140,300. Defendant Shalala is a citizen of Florida.

19.    Defendant Steven L. Gerard ("Gerard") is a Lennar director and has been since May 2000. Gerard is also a member of Lennar's Audit Committee and has been since at least 2005 and Chairman of the Compensation Committee and has been since at least 2005. Because of Gerard's position, Gerard knew, consciously disregarded or was reckless in not knowing the adverse, non-public information about the business of Lennar including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Gerard participated in the issuance of improper statements, including the preparation of the improper press releases and other statements and approval of SEC filings made to the press, securities analysts and Lennar shareholders. During the Relevant Period, Gerard sold 1,410 shares of Lennar stock for proceeds of $84,928.25. Defendant Gerard is a citizen of New York.

20.    Defendant Irving Bolotin ("Bolotin") is a Lennar director and has been since 1974. Bolotin was also Lennar's Senior Vice President from 1972 to December 1998. Bolotin is a member of Lennar's Audit Committee and Compensation Committee and has been since at least 2005. Because of Bolotin's positions, Gerard knew, consciously disregarded or was reckless in not knowing the adverse, non-public information about the business of Lennar including its finances, markets and present and future business prospects, via access to internal

- 6 -

7 of 55

corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Bolotin participated in the issuance of improper statements, including the preparation of the improper press releases and other statements and approval of SEC filings made to the press, securities analysts and Lennar shareholders. During the Relevant Period, Bolotin sold 1,500 shares of Lennar stock for proceeds of $53,180. Defendant Bolotin is a citizen of Florida.

21.     Defendant Jeffrey Sonnenfeld ("Sonnenfeld") is a Lennar director and has been since September 2005. Because of Sonnenfeld's position, Sonnenfeld knew, consciously disregarded or was reckless in not knowing the adverse, non-public information about the business of Lennar including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Sonnenfeld participated in the issuance of improper statements, including the preparation of the improper press releases and other statements and approval of SEC filings made to the press, securities analysts and Lennar shareholders. During the Relevant Period, Sonnenfeld sold 800 shares of Lennar stock for proceeds of $28,352. Defendant Sonnenfeld is a citizen of Connecticut.

22.     Defendant Sidney Lapidus ("Lapidus") is Lennar's Lead Director and has been since 2006 and a director and has been since April 1997. Because of Lapidus' positions, Lapidus knew, consciously disregarded or was reckless in not knowing the adverse, non-public information about the business of Lennar including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Lapidus participated in the issuance of improper statements,

- 7 -

including the preparation of the improper press releases and other statements and approval of SEC filings made to the press, securities analysts and Lennar shareholders. Defendant Lapidus is a citizen of New York.

23.     Defendant R. Kirk Landon ("Landon") is a Lennar director and has been since January 1999. Landon is Chairman of Lennar's Audit Committee and has been since at least 2005 and a member of the Compensation Committee and has been since at least 2005. Because of Landon's positions, Landon knew, consciously disregarded or was reckless in not knowing the adverse, non-public information about the business of Lennar including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Landon participated in the issuance of improper statements, including the preparation of the improper press releases and other statements and approval of SEC filings made to the press, securities analysts and Lennar shareholders. Defendant Landon is a citizen of Florida.

24.     Defendant David B. McCain ("McCain") was Lennar's Vice President, General Counsel and Secretary from 1998 to at least August 2006. He was also President and CEO of Lennar Financial Services, LLC from 2003 to at least August 2006. Because of McCain's positions, McCain knew, consciously disregarded, or was reckless in not knowing the adverse, non-public information about the business of Lennar including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Gross participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lennar shareholders. During the Relevant Period,

McCain sold 60,000 shares of Lennar stock for proceeds of $3,004,343.66.  Defendant McCain is a citizen of Florida.

25.     Defendant Craig M. Johnson ("Johnson") was Lennar's Vice President from May 2000 to January 2006.  Johnson was also Lennar's Regional President in 2006.  Because of Johnson's positions, Johnson knew, consciously disregarded, or was reckless in not knowing the adverse, non-public information about the business of Lennar including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Johnson participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lennar shareholders.  During the Relevant Period, Johnson sold 7,600 shares of Lennar stock for proceeds of $473,125.08.  Defendant Johnson is a citizen of Texas.

26.     Defendant Herve Ripault ("Ripault") was a Lennar director from May 2000 to March 2006.  Because of Ripault's position, Ripault knew, consciously disregarded or was reckless in not knowing the adverse, non-public information about the business of Lennar including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Ripault participated in the issuance of improper statements, including the preparation of the improper press releases and other statements and approval of SEC filings made to the press, securities analysts and Lennar shareholders.  During the Relevant Period, Ripault sold 12,480 shares of Lennar stock for proceeds of $765,082.05.  Defendant Ripault is a citizen of France.

27.     Defendant Steven J. Saiontz ("Saiontz") was a Lennar director from April 1990 to January 2006.  Because of Saiontz's position, Saiontz knew, consciously disregarded or was

- 9 -

reckless in not knowing the adverse, non-public information about the business of Lennar including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Saiontz participated in the issuance of improper statements, including the preparation of the improper press releases and other statements and approval of SEC filings made to the press, securities analysts and Lennar shareholders.  Defendant Saiontz is a citizen of Florida.

28.     The defendants identified in ¶¶15, 18-23, 26-27 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶15-17, 24-25 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶15-21, 24-26 are referred to herein as the "Insider Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers, directors and/or fiduciaries of Lennar and because of their ability to control the business and corporate affairs of Lennar, the Individual Defendants owed Lennar and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Lennar in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Lennar and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

30.     Each director and officer of the Company owes to Lennar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections

- 10 -

and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Lennar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Lennar, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations and improper representations of Lennar.

32.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Lennar, and was at all times acting within the course and scope of such agency.

33.     To discharge their duties, the officers and directors of Lennar were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Lennar were required to, among other things:

      (a)     refrain from acting upon material inside corporate information to benefit themselves;

      (b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

      (c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      (d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects and financial results and ensuring that the Company

maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how Lennar conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

34.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Lennar, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of Lennar's Board during the Relevant Period.

35.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its business prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.

### CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

36.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the

- 12 -

wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

37.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its business prospects and financial results; (ii) enhance the Individual Defendants' executive and directorial positions at Lennar and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions; (iii) allow certain defendants to sell over $15 million worth of their personally held shares; and (iv) deceive the investing public, including shareholders of Lennar, regarding the Individual Defendants' management of Lennar's operations, the Company's financial health and stability, and its future business prospects that had been misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

38.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period.  During this time, the Individual Defendants caused the Company to conceal the true fact that Lennar was misrepresenting its financial results.  In addition, defendants also made other specific, false statements about Lennar's financial performance and future business prospects, as alleged herein.

39.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise and/or common course of conduct was, among other things: (i) to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and (iii) to facilitate the sale of over $15 million worth of their personally held shares.

40.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release improper statements.  Because the actions described herein occurred under

- 13 -

the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

41.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## THE HOUSING BUBBLE AND BURST

42.     In the early part of this decade, America experienced an unparalleled housing boon.  By 2004, the United States home ownership rate peaked with an all time high of 69.2%. This was due in a large part to people taking advantage of low interest rates and novel lending devices.  According to *The Economist*, 43% of first-time buyers, and 25% of all buyers, made no down payment on homes purchased in 2004.   These novel devices included interest only adjustable rate mortgages that took advantage of low introductory interest rates that reset in a few years to higher rates.  Demand was also driven by lending to subprime borrowers, which are people with less than perfect credit who provide little or no documentation of income or down payment.  Further, demand and pricing were pushed higher by rampart speculation in the real estate market.  According to that same article in *The Economist*, 23% of all American homes bought in 2004 were for investment purposes, not owner-occupation. By summer of 2005, however, the housing market began to soften.

43.     In fact, around this time, some of the most important and well respected people on Wall Street began warning of a housing crash.  In a pre-retirement speech, then Chairman of the Federal Reserve, Alan Greenspan, warned that investing in homes was not a one-way bet and that "history had not dealt kindly" with those who kept ignoring the risks. As reported on *CNNMoney.com*, Warren Buffet and Charles Munger both issued stern warnings about the real estate bubble to a group of 20,000 investors.

- 14 -

44.     Soon after, various journals began reporting on the decline of the housing market. Some of this reporting includes:

- On June 16, 2005, *The Economist* did a cover story on the housing bubble and what would occur when it burst.  The article stated: "We have been warning for some time that the price of housing was rising at an alarming rate all around the globe, including in America. Now that others have noticed as well, the day of reckoning is closer at hand. It is not going to be pretty."

- On November 17, 2005, *CNNMoney.com*, asked whether the "Housing boom [is] past its peak?"  The article accompanying that headline noted that the pace of home sales slowed sharply as mortgage rates began to increase.

- *The Mercury News* quoted JPMorgan Chase senior economist, James Glassman, in an article printed December 31, 2005, stating that "We all sense there is a shift in the market … from a seller's market to a buyer's market."

- In January 2006, Paul Krugman wrote in *The New York Times*, that "at this point the overall market value of housing has lost touch with economic reality. And there's a nasty correction ahead."

45.     Warnings were also abundant to the Individual Defendants regarding the subprime and novel mortgage devices used to purchase homes.  In fact, as early as 2005, bankers and economists alike were expressing concern over the rising delinquency rates in nontraditional mortgages such as subprime mortgages, especially because the risk of delinquency would be heightened by a downturn in the housing market.  Some examples include:

- On August 24, 2005, *USA Today* reported that economists and bankers were "getting nervous about the wide use of higher-risk financing, such as … subprime mortgages for low-income home buyers."  As chief economist Doug Duncan of the Mortgage Bankers Association stated in the article, "[e]asy financing helps people buy homes, but also raises foreclosure risks."

- Similarly, at the CPR and CDR's Prepayment and Mortgage Credit Modeling & Strategy Conference in October 2005, Freddie Mac Chief Economist Frank Nothaft stated that "subprime delinquency rates remained worrisome, with subprime delinquencies as much as eight to nine times higher than prime loans."

- In a December 26, 2005 *Business Week* article, JPMorgan Chase estimated that risky subprime loans made up close to 9% of mortgage debt—large enough to make a downturn worse if those loans began to fail in large numbers.

- Governor Susan Schmidt Bies, a member of the Federal Reserve Board, gave a speech at the Financial Services Institute on February 2, 2006.  In her speech, Bies noted that "the Federal Reserve and other banking supervisors [were] concerned that [then-current] risk-management techniques may not

- 15 -

fully address the level of risk in nontraditional mortgages, [such as subprime mortgages] a risk that would be heightened by a downturn in the housing market." Bies also stated that lenders were increasingly combining nontraditional mortgage loans with weaker mitigating controls on credit exposures.

46.     In 2006, all these warnings came true at the same time. The housing market began to drastically slow as inventory levels out-paced demand. Then, on top of the already saturated level of housing inventory, the subprime mortgage crisis erupted.

47.     During the first stage of this crisis, several prominent subprime lenders, including New Century Financial Corporation, declared bankruptcy as liquidity dried up and the lenders found themselves unable to continue originating loans. Other subprime lenders, such as Accredited Home Lenders Holding Company, staged fire sales in a desperate attempt to raise cash to stay afloat.

48.     The crisis reached a new height when Bear Stearns & Co., a once widely respected institution, collapsed and was forced to sell itself to JPMorgan Chase at a fire sale price due to the massive losses it experienced by gambling on mortgage debt.

49.     The subprime mortgage crisis led to a further deterioration of the housing market. As housing prices fell, people no longer had enough equity in their homes to refinance their loans as interest rates reset higher. This led to an unprecedented amount of foreclosures, drastically increasing the amount of inventory in the housing market. Further, some people who desired to buy property could not get approved under new stricter lending standards that banks imposed in the aftermath of this crisis, preventing inventory from being reduced.

50.     Throughout the Relevant Period, however, the Individual Defendants recklessly directed Lennar to acquire more land, and build more inventory in an already overly saturated market. The Individual Defendants actually pointed to the Company's increases in land and communities as an example of the strength of the Company. On information and belief, the Individual Defendants were well aware of the increase in housing inventory through their access to the Company's internal estimates.

- 16 -

51.     Further, according to Lennar's annual filings with the SEC, the Company, through its subsidiaries, provides the majority of loans to its home buyers.  For instance in 2007, the Company's financial services subsidiaries provided loans to 73% of Lennar's home buyers.  In 2006 and 2005, Lennar's subsidiaries provided 66% of the loans to its home buying customers. In 2004, Lennar's subsidiaries provided approximately 71% of the loans to its home buying customers. As detailed more herein, many of these loans were the interest-only variety that led to the mortgage crisis.  Thus, the Individual Defendants were acutely aware of the risky mortgage lending practices that were occurring within the industry.  Moreover, the Individual Defendants caused or allowed Lennar to improperly report its exposure to losses from these actions as alleged herein

## IMPROPER STATEMENTS

52.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owe to Lennar a duty to ensure that the Company's public filings and statements fairly represent the operations and business prospects of the Company.  In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand how the Company operates, how it decides what guidance to give, and ensure that the guidance provided is based on competent and real estimations of the Company's business prospects.

53.     Furthermore, defendants Landon, Bolotin, and Gerard, as members of the Audit Committee, had a special duty to know and understand the Company's financial guidance procedures because, as set out in the Audit Committee's charter, the Audit Committee is responsible for assisting the Board in overseeing the integrity of the Company's financial statements, compliance with legal and regulatory requirements, reviewing the annual and quarterly financial statements of the Company, discussing the earnings press releases as well as financial information and earnings guidance provided to financial analysts and rating agencies, and discussing and reviewing the policies with respect to risk assessment and risk management.

54.     On September 26, 2005, the Individual Defendants caused or allowed the Company to issue a press release reporting its third quarter results for the fiscal year 2005.  This

- 17 -

press release included setting guidance for the fiscal year 2006 earnings per share ("EPS") at $9.25. Defendant Miller is quoted in the press release as saying the there was strong consumer demand and that the Company will "continue to strengthen our position in strategic markets through organic and acquisitive growth." In particular, the press release stated:

> Lennar Corporation, one of the nation's largest homebuilders, today reported earnings for its third quarter ended August 31, 2005. Third quarter net earnings from continuing operations in 2005 were $337.3 million, or $2.06 per share diluted, compared to net earnings from continuing operations of $225.0 million, or $1.36 per share diluted, in 2004.

> Stuart Miller, President and Chief Executive Officer of Lennar Corporation, said, "Our strong performance reflects the continued strength of the homebuilding market along with our intense focus on our homebuilding process. We exceeded our home delivery target through increased conversion of homes in backlog combined with a 340 basis point increase in gross margin percentage."

> Mr. Miller continued, "*New home sales activity continued to point to strong consumer demand as our new orders increased 24% year-over-year. As the industry continues to benefit from favorable market conditions, we continue to strengthen our position in strategic markets through organic and acquisitive growth.*"

> Mr. Miller concluded, "Assuming general economic stability and minimal impact from the recent hurricane activity, our record-level $8.1 billion backlog, strong balance sheet and strategic positioning give us confidence in our future outlook. We are increasing our fiscal 2005 earnings per share goal from $7.80 to $8.10 per share and *establishing a fiscal 2006 earnings per share goal of $9.25.*"

55.     Defendants Miller and Gross continued to state that the Company's access to strategic housing areas gave Lennar a competitive advantage the following day during a conference call regarding the Company's third quarter results for the fiscal year 2005. Also, defendant Miller acknowledged that there was talk of a housing bubble, but downplayed any concerns of a housing downturn. In fact, he called the Company's EPS guidance of $9.25 conservative and boasted of an increase in the Company's community count. Defendant Gross, meanwhile, in a response to a question from an analyst noted that the Company would increase its inventory. Defendant Miller also noted that interest-only loans accounted for 30% of the Company's total loans. In particular, during the conference call defendants Miller and Gross stated:

[Defendant Miller]:

- 18 -

Good morning everyone, and thank you for joining us for our third quarter conference call. I'm joined here by Bruce Gross, who will give a financial overview, but first I'd like to give a couple of overview comments about the Company, the quarter, and prospects for the year-- the quarter, and the year ahead.

Let me begin by saying that we are very pleased to report strong third quarter results for 2005, and very strong prospects for our fourth quarter, and for 2006. The story remains very consistent for both Lennar, and as well for the home building industry. *Across the country demand for new homes remained strong, and this is driven by strong fundamentals that continue to form a favorable environment for the new home customer.*

Relatively low interest rates, along with positive demographics, still very strong job growth, and as well income growth, and the generally strong economy at both the national, and as well the local level, continue to propel the overall home building market to consistently positive performance. *Limited supply of available land, especially in constrained markets, continues to limit inventory from speculative building, while generating pricing power going forward.*

*While the consistent strength and success in the housing market has given rise to a lot of discussion about a national housing bubble, credit quality, types of mortgages that are available, interest rate hikes, and a variety of other questions, the industry continues to show tremendous resilience, and the drivers of stability and growth rest in the fundamentals, and that is the growing population across the country that needs a place to live, the aging stock of existing dwellings, and the fundamental economic strength that's at the national, and as well the local level.*

Today we are very pleased to announce yet again record earnings for our Company for the third quarter of 2005. As you can see in our press release revenues were up a healthy 27% and that, together with a 340 basis point improvement in gross margin, fueled a 48% increase in homebuilding operating earnings.

As we look forward to the final quarter of 2005, we derive a great deal of confidence from our strong pace of new orders that were up 24%, our strong gross margin of 26.3%, and our $8.1 billion backlog, which is up 33% year-over-year. And this gives us excellent visibility to guide the full year 2005 earnings to $8.10 per share, up from our prior guidance of $7.80 per share.

*As we look ahead to 2006, we are establishing initial guidance of $9.25 per share, which reflects some conservatism due to uncertainties about the year ahead.* In looking ahead, we've considered carefully the reality that the Fed is fully focused on slowing the rapid rate of increases that we've seen in pricing in some of the most desirable and constrained markets. Accordingly we have tempered our view of price increases, particularly in what has been historically the hottest markets, and have projected only a modest overall increase for the year.

\* \* \*

*Strategically, however, we are very well-positioned in all of our major markets. Our excellent land position, particularly in land-constrained markets,*

*where there is an increasing shortage of entitled home sites, will continue to drive the future growth and earnings of our Company.*

*Our community count continues to grow, and will continue to grow throughout the year and into 2006, as many of our excellent land positions continue to translate into active communities.* Additionally our always strong balance sheet and cash positions afford us the unfettered opportunity, to continue to build on an already strong market share position, while we continue to look for new opportunities to consolidate and grow into new markets. All of these factors continue to drive strong and sound returns on capital and returns on equity that benefit the Company, and our investors in the long-term.

Our well-recognized land franchise continues to provide excellent growth and position for the future growth of our Company, while simultaneously adding to our overall profitability, as we continue to sell land, excess land to others as part of our well-known payer down strategy.

As we've grown our business and continue to enhance land position, we've continued also to be very focused on building balance sheet strength. We continue to operate at a very conservative leverage level and have maintained excellent liquidity for future growth and/or uncertainty, as we have added to our long and medium-term debt maturities to match our earnings growth. We remain a balance sheet first focused company, even while we position for future growth.

In conclusion let me say we are very optimistic about the future for the homebuilding industry in general, and in particular for our Company. It's our sense that we will continue to report record earnings for the foreseeable future.

*   *   *

[Analyst]:

Just a follow-up, just a quick housekeeping question on inventory. Didn't know if you had that on hand and also your I/O percentage of origination?

[Defendant Gross]:

Yes, as far as inventory goes we are going to see an increase in inventory, which is a seasonal buildup, and as we're well-positioned for our deliveries for the fourth quarter most of this increase is in WHIP, and we would expect would be somewhere about 7.7 billion inventory, and that increase again, the vast majority is construction in progress, as well as models.

As far as interest-only loans, I think the way to look at the mortgage side, the interest-only really for starters, covers different maturity periods. *So the interest-only has steadily increased over the last couple of years. And for us it's, it's probably about 30% of our total loans.*

56. On December 15, 2005, the Individual Defendants caused or allowed the Company to issue a press release announcing its fiscal fourth quarter and full year 2005 results. The press release re-affirmed the fiscal year 2006 EPS guidance of $9.25. Defendant Miller

- 20 -

again touted the Company's position in strategic markets as insulating the Company from problems that affected the broader housing market. In particular, the press release stated:

> Lennar Corporation, one of the nation's largest homebuilders, today reported earnings for its fourth quarter and fiscal year ended November 30, 2005. Fourth quarter net earnings from continuing operations in 2005 were $581.2 million, or $3.54 per share diluted, compared to net earnings from continuing operations of $379.4 million, or $2.29 per share diluted, in 2004.

> Stuart Miller, President and Chief Executive Officer of Lennar Corporation, said, "The intense focus on the fundamentals of our homebuilding process allowed us to achieve record results once again in fiscal 2005, as we exceeded our target and delivered a record 42,359 homes despite the 400 to 500 deliveries delayed due to the significant disruption caused by Hurricane Wilma. Overall, we are very pleased with our performance in fiscal 2005, which resulted in strong revenue growth and a 210 basis point increase in gross margin percentage on new home deliveries."

> Mr. Miller continued, "*While the industry continues to be influenced by increased regulation, we expect our homebuilding operations to continue to benefit substantially from our access to homesites in land-constrained markets. Despite signs nationally of a more normalized level of activity with regards to sales pace and price appreciation, our capital investments in these strategic markets afford us a significant competitive advantage and allow us to be well positioned for future success.*"

> Mr. Miller concluded, "As we enter fiscal 2006, our record-level $6.9 billion backlog, strong balance sheet and *strategic access to homesites position us well to achieve our previously announced fiscal 2006 earnings per share goal of $9.25.*"

57.     On March 28, 2006, the Individual Defendants caused or allowed the Company to issue a press release announcing its results for the fiscal first quarter of 2006. Despite acknowledging that home sales were slower in certain markets, defendant Miller still stated that the "we believe 2006 will be another record year and are reaffirming our 2006 earnings per share goal of $9.25." In particular, the press release stated:

> Lennar Corporation, one of the nation's largest homebuilders, today reported earnings for its first quarter ended February 28, 2006. First quarter earnings from continuing operations in 2006 were $258.1 million, or $1.58 per share diluted, compared to earnings from continuing operations of $192.8 million, or $1.17 per share diluted, in 2005.

> Stuart Miller, President and Chief Executive Officer of Lennar Corporation, said, "We are pleased to report record results for our first quarter, where we produced a 35% increase in both revenues and earnings per share from continuing operations, compared to last year. These record results were supported by a strong performance from both our homebuilding and land divisions."

- 21 -

Mr. Miller continued, "While there has been a slower sales pace in certain markets in which we operate and price appreciation in these markets has moderated relative to the appreciation experienced in the past few years, we were still able to achieve a 4% increase in new orders during the first quarter. We are focused on maintaining a sales pace that supports our current and planned inventory levels, and we believe that our intense focus on asset management and our homebuilding manufacturing process will set the foundation to achieve a more evenflow production of home deliveries."

*Mr. Miller concluded, "As a result of our $7.1 billion backlog, we believe 2006 will be another record year and are reaffirming our 2006 earnings per share goal of $9.25. Given our strong balance sheet liquidity, we are well positioned for organic growth as well as strategic growth opportunities as they arise*."

### TROUBLES IN THE HOUSING MARKET SLOWLY COME TO LIGHT

58.	On April, 12 2006, *The Wall Street Journal* reported that the housing market was cooling in some of the largest markets. This cooling included a 20% drop in new home sales in Florida, a 15% drop in new home sales in California, and an overall new home sales fall of 10.5% nationwide. Florida and California are two of the Company's largest markets.

59.	Soon after, the bad news concerning the housing market began arriving from the Company's competitors. In a press release on April 26, 2006, Centex Corporation announced that it was slashing its earnings forecast from $10.75 to $11.25 per share to $8.50 to $10 per share. In May 2006, Toll Bros. Inc and Hovnanian Enterprises Inc. announced that new orders had fallen at least 20%.

60.	On June 6, 2006, Wachovia Corp. analyst Carl Reichardt downgraded his estimates for 4 of the 5 largest homebuilders. Reichardt stated that the housing demand slowdown would be worse than expected and home builders were now facing a 35% jump in new and existing home inventory from a year ago.

61.	On June 26, 2006, the Individual Defendants caused or allowed the Company to issue a press release detailing the results of the fiscal second quarter of 2006. In this press release, defendant Miller acknowledged that the housing market had slowed and that EPS would have to be revised downward to $8.00 to $8.25 from $9.25. Defendant Miller also noted that the Company was experiencing slower new orders and higher cancellation rates. Defendant Miller attempted to down-play the importance of this information, however, by stating "[w]e have

- 22 -

consistently focused on a balance sheet first approach to managing our operations. This strategy works particularly well in slower market cycles." Defendant Miller also stated that "favorable demographic trends and high employment levels bode well for long-term homebuilding fundamentals." In particular, the press release stated:

> Lennar Corporation, one of the nation's largest homebuilders, today reported earnings for its second quarter ended May 31, 2006. Second quarter earnings from continuing operations in 2006 were $324.7 million, or $2.00 per share diluted, compared to earnings from continuing operations of $233.2 million, or $1.42 per share diluted, in 2005.

> Stuart Miller, President and Chief Executive Officer of Lennar Corporation, said, "After a long period of steady growth, the homebuilding industry has slowed, as evidenced by lower new orders and higher cancellation rates in many geographic markets across the country. These conditions are primarily the result of speculators exiting the market and changing homebuyer sentiment. *Although current market conditions have softened, we believe favorable demographic trends and high employment levels bode well for long-term homebuilding fundamentals."*

> *Mr. Miller continued, "Even while market conditions have been changing, we have maintained a focused and orderly approach to managing our operations with an intensified emphasis on maintaining strong cash flow generation and achieving evenflow production.* This focus resulted in a 56% increase in revenues and a 41% increase in earnings per share from continuing operations, compared to our second quarter last year. However, we are experiencing slower new orders and higher cancellation rates. Consequently, the second half of the year will be more challenging. As a result, we are focusing our efforts on partially offsetting the effects of increased sales incentives by reducing land costs, production costs and selling, general and administrative expenses."

> Mr. Miller concluded, "*We have consistently focused on a balance sheet first approach to managing our operations.* This strategy works particularly well in slower market cycles. During the second quarter, we repurchased 5.0 million shares of stock while at the same time maintained a strong and liquid balance sheet as evidenced by our homebuilding debt to total capital of 33.5% and only $185 million borrowed under our revolving credit facility. Although we are revising our EPS goal downward to a range of $8.00 to $8.25 at this time, we recognize that market conditions are continually changing. *Our operating strategy and strong balance sheet should enable us to respond to these changing conditions and to take advantage of opportunities as they present themselves.*"

62.     Between April 11, 2006 and June 27, 2006, while these true facts about the housing market began were revealed, the Company's value price fell from $60.78 to $43.97, a 28% drop.

## THE TRUTH IS PARTIALLY REVEALED

63.    On September 26, 2006, the Individual Defendants caused or allowed the Company to issue a press release detailing the results of its fiscal third quarter of 2006.  In the press release, defendant Miller announced that the Company was lowering its fourth quarter EPS guidance to a range of $1.00 to $1.30 per share.  Further, defendant Miller, announced that the Company was reducing its land inventory, a clear admission that Lennar had over-bought during the housing bubble.  Defendant Miller, however, continued to emphasize the steps the Company was taking to shield itself from the housing crisis, stating that "[w]e believe our strategy will continue to improve our cash flow and balance sheet from already excellent positions."   In particular, the press release stated:

> Lennar Corporation one of the nation's largest homebuilders, today reported earnings for its third quarter ended August 31, 2006. Third quarter earnings in 2006 were $206.7 million, or $1.30 per diluted share, compared to earnings of $337.3 million, or $2.06 per diluted share, in 2005. Third quarter results were within the Company's previously announced revised goal of $1.25 to $1.35 per diluted share.

> Stuart Miller, President and Chief Executive Officer of Lennar Corporation, said, "The U.S. housing market has continued to deteriorate, trailing down further and faster than anticipated. Under these difficult conditions, we remain focused on our strategy of carefully managing inventory, reducing construction costs and overhead, methodically tapering back production and emphasizing cash generation. *We have limited our land purchases and reduced standing inventory through strategic asset management. Additionally, we have emphasized salesmanship and simplicity in the field which help control costs in the management of our business. We believe our strategy will continue to improve our cash flow and balance sheet from already excellent positions.*"

> *Mr. Miller continued, "Our strong balance sheet and cash flow provide a solid foundation for current operations during declining market conditions and will enable us to capitalize on strategic growth opportunities as the market solidifies.*"

> Mr. Miller concluded, "We believe that our balance sheet-first approach to managing our business serves as an excellent strategy through both up and down cycles in the homebuilding industry. Although the economy remains strong and unemployment and interest rates remain relatively low, it is not clear that the homebuilding downturn has yet found a floor. Due to this uncertainty, we are updating our fourth quarter goal downward to a broad range of $1.00 to $1.30 per share."

- 24 -

64.    On January 17, 2007, the Company issued a press release detailing its fiscal fourth quarter and full year 2006 results. The Company reported a net loss for the fourth quarter of $195.6 million. The press release stated that EPS for 2006 was $3.69, almost a full $6 per share below initial guidance. The press release also revealed that gross margins on home sales for the 2006 fiscal year were down 6% from the previous year. Further, the Company lost $30 million on land sales, including a write off of $152.2 million, compared with a profit of $200 million the year before. Further, new orders for homes were down 3% from the previous years and the Company's backlog declined 42%. In particular, the press release stated:

2006 Fiscal Year

- Revenues of $16.3 billion – up 17%

- ***EPS of $3.69 – includes write-offs of option deposits and pre-acquisition costs of $152.2 million and valuation adjustments of $476.0 million***

- Homebuilding operating earnings of $986.2 million – includes write-offs and valuation adjustments noted above

- Financial Services operating earnings of $149.8 million – up $45.0 million

- Deliveries of 49,568 homes – up 17%

- ***New orders of 42,212 homes – down 3%***

- ***Backlog dollar value of $4.0 billion – down 42%***

\* \* \*

… Lennar Corporation, one of the nation's largest homebuilders, today reported results for its fourth quarter and fiscal year ended November 30, 2006. ***Fourth quarter net loss in 2006 was $195.6 million, or $1.24 per diluted share, compared to net earnings of $581.2 million, or $3.54 per diluted share, in 2005***.

Stuart Miller, President and Chief Executive Officer of Lennar Corporation, said, "As we noted in our pre-earnings release, market conditions have remained depressed through the end of our fourth quarter. In this environment, we have continued to focus on strengthening our balance sheet. We have continued to build-out our inventory, deliver our backlog and convert inventory into cash. With a balance sheet-first focus, we have priced our homes to market conditions and maintained an "inventory neutral" position. Accordingly, our land inventory and homes under construction have declined throughout the second half of 2006."

- 25 -

\* \* \*

YEAR ENDED NOVEMBER 30, 2006 COMPARED TO
YEAR ENDED NOVEMBER 30, 2005

Homebuilding

Revenues from home sales increased 17% in the year ended November 30, 2006 to $14.9 billion from $12.7 billion in 2005. Revenues were higher primarily due to a 15% increase in the number of home deliveries in 2006. New home deliveries, excluding unconsolidated entities, increased to 47,032 homes in the year ended November 30, 2006 from 40,882 homes last year. In the year ended November 30, 2006, new home deliveries were higher in each of the Company's homebuilding segments and Homebuilding Other, compared to 2005. The average sales price of homes delivered increased to $315,000 in the year ended November 30, 2006 from $311,000 in 2005 despite higher sales incentives offered to homebuyers ($32,000 per home delivered in 2006, compared to $9,000 per home delivered in 2005).

***Gross margins on home sales excluding inventory valuation adjustments were $3.0 billion, or 20.3%, in the year ended November 30, 2006, compared to $3.3 billion, or 26.0%, in 2005. Gross margin percentage on home sales decreased compared to last year in all of the Company's homebuilding segments*** and Homebuilding Other primarily due to higher sales incentives offered to homebuyers. Gross margins on home sales including inventory valuation adjustments were $2.7 billion, or 18.4%, in the year ended November 30, 2006 due to $280.5 million of inventory valuation adjustments ($157.0 million, $27.1 million, $79.0 million and $17.4 million, respectively, in the Company's Homebuilding East, Central and West segments and Homebuilding Other).

Selling, general and administrative expenses as a percentage of revenues from home sales were 11.9% and 11.1%, respectively, for the years ended November 30, 2006 and 2005. The 80 basis point increase was primarily due to increases in broker commissions and advertising expenses, partially offset by lower incentive compensation expenses. Management fees of $37.4 million received during the year ended November 30, 2005 from unconsolidated entities in which the Company has investments, which were previously recorded as a reduction of selling, general and administrative expenses, have been reclassified to management fees and other income, net in order to conform to the 2006 presentation.

***Loss on land sales totaled $30.0 million in the year ended November 30, 2006, net of $152.2 million of write-offs of deposits and pre-acquisition*** costs ($80.5 million, $2.9 million, $44.0 million and $24.8 million, respectively, in the Company's Homebuilding East, Central and West segments and Homebuilding Other) related to 24,235 homesites under option that the Company does not intend to purchase and $69.1 million of inventory valuation adjustments ($24.7 million, $17.3 million and $27.1 million, respectively, in the Company's Homebuilding East and Central segments and Homebuilding Other), compared to gross profit of $200.8 million in 2005. Equity in earnings (loss) from unconsolidated entities was ($12.5) million in the year ended November 30, 2006, which included $126.4 million of valuation adjustments ($25.5 million, $92.8 million and $8.1 million,

respectively, in the Company's Homebuilding East and West segments and Homebuilding Other) to the Company's investments in unconsolidated entities, compared to $133.8 million last year. Management fees and other income, net, totaled $66.6 million in the year ended November 30, 2006, compared to $99.0 million in 2005. Minority interest expense, net was $13.4 million and $45.0 million, respectively, in the years ended November 30, 2006 and 2005. Sales of land, equity in earnings (loss) from unconsolidated entities, management fees and other income, net and minority interest expense, net may vary significantly from period to period depending on the timing of land sales and other transactions entered into by the Company and unconsolidated entities in which it has investments.

65.    Despite all the negative factors effecting Lennar, defendant Miller still stated, in that same January 17, 2007 press release, that the Company "will meet or exceed our 2006 earnings of $3.69 per share" for the fiscal year 2007. In particular, the press release stated:

Mr. Miller continued, "As we look ahead to 2007, the strength of our balance sheet, together with our renegotiated land positions that reflect current market conditions, provide the springboard from which we will rebuild our margins. To that end, we have identified four focal points that will drive our margin improvement in 2007: right-sizing S,G&A expenses to match both current volume and efficiencies, reducing construction costs, redesigning product to meet today's market demand and building on land at current market prices. We will also continue to carefully match our starts to demand, and as a result, we estimate deliveries will decline in excess of 20% in 2007, compared to 2006."

Mr. Miller concluded, "Uncertain market conditions make it difficult to provide a 2007 earnings goal. *While we know that the margin in our backlog will result in lower profitability in the first half of 2007, we believe that if the current environment of strong employment, low interest rates and a healthy economy continues, and the market for new homes demonstrates traditional, seasonal improvement, we will meet or exceed our 2006 earnings of $3.69 per share*."

66.    The stock market reacted favorably to defendant Miller's comments implying the worst of the housing crisis had passed.  In the coming weeks, the Company's value would close above $56 per share.  Defendant Miller's own actions, however, betrayed the truth of the housing crisis' effect on Lennar.  On February 16, 2007, defendant Miller sold over 70 thousand shares of Lennar stock for approximately $3.7 million.   When Miller's sales became public, the Company's value dropped.

## THE TRUTH CONTINUES TO LEAK OUT THROUGH A SERIES OF INADEQUATE WRITE-OFFS AND VALUATION ADJUSTMENTS

67.    The negative results for Lennar have continued since the January 17, 2007 press release.  On March 27, 2007, the Company announced the results for the fiscal first quarter of

2007. According to the press release, revenues decreased 14%, operating earnings were down 69%, new home orders decreased 27%, and the cancellation rate was at 29%. Further, the Company would take a $91.6 million charge related to valuation adjustments and write-offs. Defendant Miller announced that the Company would not meet its previously stated 2007 earnings goals, and would not provide any future guidance. In particular, the press release stated:

- ***Revenues of $2.8 billion – down 14%***

- EPS of $0.43 – includes a $175.9 million pretax gain on the LandSource transaction and a ***$91.6 million pretax charge related to FAS 144 valuation adjustments and write-offs of option deposits and pre-acquisition costs***

- ***Homebuilding operating earnings of $140.0 million – down 69%***

- Financial Services operating earnings of $15.9 million – up $5.2 million

- Homebuilding debt to total capital improved to 30.9% from 36.0% (net homebuilding debt to total capital of 28.6%)

- ***New orders of 7,132 homes – down 27%; cancellation rate of 29%***

\* \* \*

… Lennar Corporation, one of the nation's largest homebuilders, today reported results for its first quarter ended February 28, 2007. First quarter net earnings in 2007 were $68.6 million, or $0.43 per diluted share, compared to first quarter net earnings of $258.1 million, or $1.58 per diluted share, in 2006.

Stuart Miller, President and Chief Executive Officer of Lennar Corporation, said, "The housing market continues to demonstrate overall weakness. While some markets are performing better than others, the typically stronger spring selling season has not yet materialized. These soft market conditions have been exacerbated by the well-publicized problems in the subprime lending market."

Mr. Miller continued, "As weak market conditions have persisted, we have continued to focus on our 'balance sheet first' strategy. Since early 2006, we have focused on fortifying our balance sheet by carefully managing inventory levels (converting both land and home inventory to cash) and significantly reducing land purchases and starts. ***Concurrently, we have adjusted our land assets where appropriate while we have written-off option deposits and pre-acquisition costs on land we no longer desire to close.***"

- 28 -

"Additionally, we completed the LandSource transaction this quarter, further strengthening our balance sheet with the receipt of approximately $700 million of cash during the quarter. The strong sponsorship of LandSource, coupled with the land availability primarily created by builders walking away from option deposits, positions us for new opportunities to purchase favorably-priced, larger land parcels within LandSource."

"While we are primarily focused on fortifying our balance sheet, we are concurrently focused on rebuilding our profit margins. Given current market conditions, we are continuing to pursue cost reductions, SG&A savings, product redesign and proper land pricing in order to see margin improvement starting in the second half of 2007. Until we see prices stabilize, however, we will not be able to project the timing or the scope of margin recovery, or set earnings goals for the company."

"We are very pleased that we ended our first quarter with our net homebuilding debt to total capital at 28.6%. Our strong balance sheet will position us well for success as market conditions recover. In the interim, we will continue to manage our business with day-by-day focus on maintaining a very low inventory balance and a consistent pressure on reducing costs as we rebuild our margins."

Mr. Miller concluded, "***Given the state of the market, we do not expect to achieve our previously stated 2007 earnings goal, and we are not comfortable providing a new earnings goal at this time***. Our company remains focused on managing through this downturn with a balance sheet first strategy, maintaining ample liquidity to position us well for future opportunities."

68.     On June 26, 2007, the Company issued a press release announcing its fiscal second quarter results for 2007.  The Company announced that it had a loss per share of $1.55. Further, revenues were down 37% and backlog down 56%.  Further, the Company wrote-off $329.1 million due to loss of deposits, valuation adjustments and other charges.   In the press release, defendant Miller admitted that the housing market continued to deteriorate and that the supply of new and existing homes continued to increase.   According to the press release, adjusting pricing to the market resulted in lower margins and increased impairments.   In particular, the press release stated:

- ***Revenues of $2.9 billion – down 37%***

- ***Loss per share of $1.55 (includes a $1.33 per share charge related to FAS 144 valuation adjustments and write-offs of option deposits and pre-acquisition costs)***

- ***Homebuilding operating loss of $351.7 million (includes $329.1 million of FAS 144 valuation adjustments and write-offs*** noted above)

- 29 -

- Financial Services operating earnings of $14.2 million – down $20.4 million

- Homebuilding debt to total capital improved to 31.6% from 33.5% (net homebuilding debt to total capital of 29.6%)

- *Deliveries of 9,568 homes – down 28%*

- *New orders of 8,056 homes – down 31%; cancellation rate of 29%*

- *Backlog dollar value of $2.8 billion – down 56%*

\* \* \*

… Lennar Corporation, one of the nation's largest homebuilders, today reported results for its second quarter ended May 31, 2007. *Second quarter net loss in 2007 was $244.2 million, or $1.55 per diluted share, compared to second quarter net earnings of $324.7 million, or $2.00 per diluted share, in 2006.*

Stuart Miller, President and Chief Executive Officer of Lennar Corporation, said, "*The housing market has continued to deteriorate throughout the second quarter. The supply of new and existing homes has continued to increase resulting in declining home prices across our markets. We have continued to adjust pricing to meet today's market conditions. This has allowed us to carefully manage inventory levels; however, it has also resulted in lower margins and further impairments.*"

Mr. Miller continued, "We have remained focused on our balance sheet first approach. Through our quarterly operating performance and asset management review process, we have refined individual asset strategies and values based on current market conditions. As the market and our operating results have declined, our focus on strong cash flow generation has continued to strengthen our balance sheet."

"Our management team continues to be very focused on daily operations. We are using the slow market conditions to refine our operating processes and improve efficiencies. We are focused on the four steps of our operating strategy: rightsizing SG&A expenses, reducing hard construction costs, driving sales and aggressively managing our assets. We continue to aggressively manage our inventory levels by converting inventory to cash, and reducing both land purchases and starts."

Mr. Miller concluded, "As we look to our third quarter and the remainder of 2007, we continue to see weak, and perhaps deteriorating, market conditions. Given uncertain market conditions, we continue to lack visibility as to future results, but we currently expect to be in a loss position in our third quarter. While second quarter results are disappointing, in these weak market conditions, we will remain focused on our balance sheet first strategy which should position us well for future opportunities."

69.    On September 25, 2007, the Company announced its results for the third quarter

of fiscal year 2007.   The Company announced a loss per share of $3.25.   Homebuilding

- 30 -

operations resulted in a loss of $787.7 million, which included $847.5 million worth of valuation adjustments and write-offs.  Further, new orders, deliveries and backlog value were all down, while the cancellation rate increased.  In particular, the press release stated:

- *Revenues of $2.3 billion – down 44%*

- *Loss per share of $3.25* (includes a $3.33 per share charge related to valuation adjustments and write-offs of option deposits and pre-acquisition costs, goodwill and financial services notes receivable)

- *Homebuilding operating loss of $787.7 million (includes $847.5 million of homebuilding valuation adjustments and write-offs* noted above)

- Financial Services operating loss of $5.2 million (includes $9.3 million of write-offs of notes receivable)

- Homebuilding debt decreased $212.8 million; homebuilding debt to total capital of 33.5%

- *Deliveries of 7,636 homes – down 41%*

- *New orders of 5,804 homes – down 48%; cancellation rate of 32%*

- *Backlog dollar value of $2.2 billion – down 60%*

\* \* \*

… Lennar Corporation one of the nation's largest homebuilders, today reported results for its third quarter ended August 31, 2007. Third quarter net loss in 2007 was $513.9 million, or $3.25 per diluted share, compared to third quarter net earnings of $206.7 million, or $1.30 per diluted share, in 2006.

Stuart Miller, President and Chief Executive Officer of Lennar Corporation, said, "It is already well documented that the housing market has continued to deteriorate throughout our third quarter. Heavy discounting by builders, and now the existing home market as well, has continued to drive pricing downward. Consumer confidence in housing has remained low, while the mortgage market has continued to redefine itself, creating higher cancellation rates."

Mr. Miller continued, "Our response to, and primary focus in, this environment continues to be to adjust pricing to meet current market conditions in order to keep inventories low and to keep our balance sheet positioned for the future. The net effect has been a continued deterioration of our net margin and accordingly, higher impairments to our inventory."

"We also have, and continue to, reduce overhead to be 'right-sized' for new and anticipated lower volume levels. While it has been challenging to stay ahead of rapidly adjusting market conditions and resulting revenue reductions, we

- 31 -

have reduced our workforce to date by approximately 35% and expect continued reductions in the fourth quarter."

Mr. Miller concluded, "The combination of moving our stated inventory to current market valuations, 'right-sizing' our overhead to reduced volume levels and a stabilization of market conditions should ultimately bring us back to profitability."

70.     On January 24, 2008, the Company announced its fiscal fourth quarter and full year 2007 results.  The Company lost $7.92 per share in the fourth quarter and $12.31 per share for the entire year.  Revenues, deliveries, new orders and backlog all decreased.  For the fourth quarter, the Company wrote down another $1.86 billion due to valuation adjustments and other write-offs.  These write-downs included selling a group of properties which had a book value of $1.3 billion to an affiliate of Morgan Stanley & Co., Inc. for only $525 million, a $740 million adjustment.  In particular, the press release stated:

2007 Fiscal Year

- *Revenues of $10.2 billion – down 37%*

- *Loss per share of $12.31 (includes a $12.62 per share charge related to valuation adjustments and other write-offs)*

- *Deliveries of 33,283 homes – down 33%*

- *New orders of 25,753 homes – down 39%; cancellation rate of 30%*

- *Backlog dollar value of $1.4 billion – down 65%*

- *Homesites owned and controlled at year-end of 148,671 – down 47%*

- Homebuilding debt decreased $318.1 million; homebuilding debt to total capital of 37.5% (net homebuilding debt to total capital of 30.2%)

- $642.5 million of cash at year-end

- Tax refund of $852 million received subsequent to year-end

- No outstanding balance under the Company's credit facility at year-end

- Revolving credit facility amended, which reduced the Company's borrowing capacity from $3.1 billion to $1.5 billion and amended certain debt covenants

* * *

... Lennar Corporation, one of the nation's largest homebuilders, today reported results for its fourth quarter and fiscal year ended November 30, 2007. *Fourth quarter net loss in 2007 was $1.3 billion, or $7.92 per diluted share, compared to a net loss of $195.6 million, or $1.24 per diluted share, in 2006. The net loss for the year ended November 30, 2007 was $1.9 billion, or $12.31 per diluted share, compared to net earnings of $593.9 million, or $3.69 per diluted share ($3.76 per basic share).*

Stuart Miller, President and Chief Executive Officer of Lennar Corporation, said, "While we are hopeful that recent interest rate moves by the Federal Reserve and recent plans proffered by the Federal government will have a stabilizing impact on the housing market, market conditions remained depressed and, in fact, continued a downward slide through the end of our fourth quarter."

"Accordingly, our strategy has been to aggressively reconcile our asset valuations to the reality of existing market conditions and to remain primarily focused on cash generation by aggressively converting inventory into cash. As is reflected in our year-end numbers, we have taken meaningful steps along these lines."

Mr. Miller continued, "To that end, we have continued to price homes to current market conditions, build-out our inventory, deliver our backlog and maintain low inventory levels. We have significantly reduced our operations in each market to reflect the sales pace of the market."

"Additionally, we have finalized a number of strategic land and joint venture transactions and walked away from option deposits in order to generate or protect cash to fortify our balance sheet. As a result, our land inventory and homes under construction have declined throughout the second half of 2007."

"As a by-product of our strategic fourth quarter moves, we have generated losses that have resulted in the receipt of a cash tax refund of $852 million subsequent to the close of the quarter."

Mr. Miller concluded, "As we look ahead to 2008, we are not expecting market conditions to improve, and perhaps might continue to decline in the near term. Nevertheless, the strength of our balance sheet, bolstered by the cash generated through our fourth quarter strategic moves, will keep us well positioned to weather these turbulent times. Additionally, our management focus on right-sizing our business, revising our product offering and reducing construction costs, together with our restated land positions that reflect current market conditions, will provide the springboard from which we will rebuild margins once the market does stabilize."

* * *

*Loss on land sales totaled $1.2 billion in the fourth quarter of 2007, which included $740.4 million of FAS 144 valuation adjustments on the inventory acquired by the Morgan Stanley land investment venture discussed below, $229.7 million of FAS 144 valuation adjustments and $217.6 million of write-offs of deposits and pre-acquisition costs related to 12,500 homesites under option that the Company does not intend to purchase.* In the fourth quarter of 2006, loss on land sales totaled $119.9 million, which included $33.3

- 33 -

million of FAS 144 valuation adjustments and $111.1 million of write-offs of deposits and pre-acquisition costs related to 9,400 homesites that were under option.

In November 2007, the Company and Morgan Stanley Real Estate Fund II, L.P., an affiliate of Morgan Stanley & Co., Inc., formed a strategic land investment venture to acquire, develop, manage and sell residential real estate. The Company acquired a 20% ownership interest and 50% voting rights in the land investment venture. Concurrent with the formation of the land investment venture, the Company sold a diversified portfolio of its land to the venture for $525 million. ***The properties acquired by the new entity consist of approximately 11,000 homesites in 32 communities located throughout the country. The properties sold by the Company had a net book value of approximately $1.3 billion.*** As part of the transaction, the Company entered into option agreements and obtained rights of first offer providing the Company the opportunity to purchase certain finished homesites. The exercise price of the options is based on a fixed percentage of the future home price. The Company has no obligation to exercise these options and cannot acquire a majority of the entity's assets. The Company is managing the land investment venture's operations and receives fees for its services. The Company will also receive disproportionate distributions if the investment venture exceeds certain financial targets.

71.    On, March 27, 2008, the Company issued a press release detailing its results for the fiscal first quarter of 2008.  The Company again fared badly as revenues, deliveries, new orders and backlog all decreased.  Further, the Company's results included $107 million worth of write-offs and valuation adjustments.  In particular, the press release stated:

- ***Revenues of $1.1 billion – down 62%***

- Loss per share of $0.56 (includes a $0.38 per share charge related to valuation adjustments and write-offs of option deposits and pre-acquisition costs)

- Homebuilding operating loss of $109.8 million (includes $107.1 million of valuation adjustments and write-offs noted above)

- Gross margin on home sales of 14.3% – up 50 basis points

- Homebuilding cash of $1.1 billion as of February 29, 2008

- No outstanding balance under the Company's credit facility as of February 29, 2008

- Homebuilding debt to total capital of 38.2% (net homebuilding debt to total capital of 24.5%)

- ***Deliveries of 3,596 homes – down 60%***

- ***New orders of 3,045 homes – down 57%; cancellation rate of 26%***

- 34 -

- ***Backlog dollar value of $1.2 billion – down 67%***

\* \* \*

… Lennar Corporation, one of the nation's largest homebuilders, today reported results for its first quarter ended February 29, 2008. First quarter net loss in 2008 was $88.2 million, or $0.56 per diluted share, compared to first quarter net earnings of $68.6 million, or $0.43 per diluted share, in 2007.

Stuart Miller, President and Chief Executive Officer of Lennar Corporation, said, "Market conditions have remained challenged and continued to deteriorate throughout our first quarter of 2008. ***The housing industry continues to be impacted by an unfavorable supply and demand relationship, which restricts the volume of new home sales and, concurrently, depresses home prices in most markets across the country.***"

"Home inventories have been expanding due to the high number of foreclosures, negotiated 'short sales,' and stretched homeowners looking to sell homes they can no longer afford. While sales are occurring and clearing prices are being reached, the pace of overall housing inventory growth is exceeding absorption at the current time."

"Concurrently, lower consumer confidence has quieted demand among prospective homebuyers and deterred them from a buying decision, while contraction in the lending markets has reduced the availability of credit for those prospective homebuyers that do wish to buy a home."

"On a more optimistic note, numerous initiatives, both private and public, have been designed and proposed to move towards stabilization and resolution. There is a growing consensus that the deterioration of the housing market has likely led us into recession, and the stabilization and recovery of the housing market will likely lead us out. Accordingly, we expect that some of these initiatives and the many that are being discussed will lead to a bottom and recovery."

Mr. Miller continued, "Our first quarter results reflect the fact that our balance sheet has been and continues to be our top priority. With most of the significant work on asset impairment behind us, throughout our first quarter we have remained focused on the delivery of our backlog, curtailing land purchases where possible, restructuring our joint ventures where necessary, and right-sizing our operations in order to protect cash, preserve value and fortify our balance sheet."

"To that end, we are very pleased that we ended our first quarter with over $1 billion in cash and no outstanding balance under our credit facility. In addition, we have reduced the number of our joint venture partnerships by approximately one-third to 180 and our maximum joint venture recourse debt by approximately one-half to $917 million, from their peak levels in 2006."

Mr. Miller concluded, "As we look ahead to the remainder of 2008, we recognize that market conditions are likely to remain challenging in the near term. Accordingly, we will continue to work diligently on rebuilding margins and ultimately, profitability as well. With a longer-term perspective, we believe that

- 35 -

government action and normal market clearing will work together to lead the housing market to stabilization and ultimately recovery."

72.    With each new negative quarter and further markdowns, the market lost more faith in the Company.  Overall, the Company's market capitalization has fallen 80%, over $8 billion, thus far during the Relevant Period.  Moreover, confidence in the Company and its management was further eroded by the method in which the Company disclosed its $3.2 billion worth of write-offs and valuation adjustments.  The Individual Defendants caused Lennar to gradually adjust its valuations instead of immediately marking the Company's inventory to market.  The clearest indication that the Individual Defendants did not direct the Company to properly adjust the value of its inventory is the sale of 11,000 homesites to an affiliate of Morgan Stanley, in which the Company received only a little more than a third of the homesites' supposed book value.

## REASONS THE STATEMENTS WERE IMPROPER

73.    Lennar's Relevant Period statements, described above, failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded or were reckless in not knowing:

(a)    the housing market was oversaturated with new homes;

(b)    demand for new homes was softening materially;

(c)    the number of contracts Lennar was actually signing for future sales/delivery of its homes was slowing;

(d)    mortgage lenders, including the Company, were making risky loans using novel loan devices;

(e)    a downturn in the housing market in particular, and the economy in general, would cause an increase in the cancellation rate of new home orders;

(f)    Lennar would have to reduce the price of its new homes in order to move inventory, drastically reducing its margins;

(g)    Lennar's write downs and valuation adjustments were continually inadequate; and

- 36 -

(h)     Lennar's access to homesites in land-constrained markets did not insulate the Company from a downturn in the housing market.

## THE IMPROPER BUYBACK

74.     During the Relevant Period, while Lennar's stock was artificially inflated due to the improper statements described above, the Director Defendants authorized the buyback of over $293 million worth of Lennar's Class A shares at an average price of approximately $54.25 per share and $72 million worth of Lennar's Class B shares at an average price of approximately $43.82, which is substantially higher than Lennar's share price when its true business health was revealed, dropping Lennar's stock to $12.99 and $11.96 per share, respectively.  On information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider the Company's exposure to the housing market crisis.  While Lennar was repurchasing these shares, the Insider Selling Defendants made the sales described herein.

## INSIDER SELLING

75.     While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Lennar stock:

| Insider Last Name | Transaction Date | Shares | Class | Price | Proceeds |
|---|---|---|---|---|---|
| BESSETTE | 1/3/2006 | 10,000 | A | $60.54 | $605,370.00 |
| | 1/3/2006 | 3 | A | $62.52 | $187.56 |
| | 1/4/2006 | 1,000 | B | $57.33 | $57,330.00 |
| | 6/22/2006 | 10,410 | A | $44.61 | $464,390.10 |
| | 1/24/2007 | 10,000 | A | $53.52 | $535,244.00 |
| | 4/17/2007 | 357 | A | $41.55 | $14,831.57 |
| | 2/27/2008 | 1,397 | A | $20.75 | $28,987.75 |
| | | **33,167** | | | **$1,706,340.98** |
| | | | | | |
| BOLOTIN | 7/16/2007 | 500 | A | $35.44 | $17,720.00 |
| | 7/16/2007 | 1,000 | A | $35.46 | $35,460.00 |
| | | **1,500** | | | **$53,180.00** |
| | | | | | |
| GERARD | 4/3/2006 | 1,410 | A | $60.23 | $84,928.25 |
| | | **1,410** | | | **$84,928.25** |
| | | | | | |
| GROSS | 10/3/2005 | 40,000 | A | $62.01 | $2,480,444.00 |

| | | | | | |
|---|---|---|---|---|---|
| | 1/23/2007 | 42,010 | A | $53.66 | $2,254,185.18 |
| | 1/24/2007 | 14,400 | A | $53.67 | $772,914.24 |
| | | **96,410** | | | **$5,507,543.42** |
| | | | | | |
| JOHNSON | 12/27/2005 | 7,600 | A | $62.25 | $473,125.08 |
| | | **7,600** | | | **$473,125.08** |
| | | | | | |
| MCCAIN | 1/23/2006 | 18,000 | A | $61.20 | $1,101,657.60 |
| | 1/25/2006 | 4,200 | A | $61.57 | $258,599.88 |
| | 6/22/2006 | 12,143 | A | $44.61 | $541,699.23 |
| | 6/28/2006 | 2,800 | B | $40.00 | $112,000.00 |
| | 6/28/2006 | 22,857 | A | $43.33 | $990,386.95 |
| | | **60,000** | | | **$3,004,343.66** |
| | | | | | |
| MILLER | 2/16/2007 | 5,000 | A | $52.10 | $260,500.00 |
| | 2/16/2007 | 5,000 | A | $52.20 | $261,000.00 |
| | 2/16/2007 | 5,000 | A | $52.25 | $261,250.00 |
| | 2/16/2007 | 5,000 | A | $52.35 | $261,750.00 |
| | 2/16/2007 | 10,000 | A | $52.40 | $524,000.00 |
| | 2/16/2007 | 5,000 | A | $52.45 | $262,250.00 |
| | 2/16/2007 | 10,000 | A | $52.50 | $525,000.00 |
| | 2/16/2007 | 5,000 | A | $52.60 | $263,000.00 |
| | 2/16/2007 | 4,200 | A | $52.60 | $220,920.00 |
| | 2/16/2007 | 800 | A | $52.62 | $42,096.00 |
| | 2/16/2007 | 4,290 | A | $52.70 | $226,083.00 |
| | 2/16/2007 | 4,300 | A | $52.75 | $226,825.00 |
| | 2/16/2007 | 400 | A | $52.76 | $21,104.00 |
| | 2/16/2007 | 300 | A | $52.77 | $15,831.00 |
| | 2/16/2007 | 5,000 | A | $52.80 | $264,000.00 |
| | 2/16/2007 | 990 | A | $52.90 | $52,371.00 |
| | 2/16/2007 | 210 | A | $52.91 | $11,111.10 |
| | | **70,490** | | | **$3,699,091.10** |
| | | | | | |
| RIPAULT | 12/20/2005 | 300 | B | $57.04 | $17,112.00 |
| | 12/20/2005 | 3,000 | A | $62.07 | $186,210.00 |
| | 1/12/2006 | 2,000 | A | $65.04 | $130,080.00 |
| | 3/30/2006 | 600 | B | $56.04 | $33,624.00 |
| | 3/30/2006 | 3,500 | A | $60.31 | $211,100.05 |
| | 3/30/2006 | 3,080 | A | $60.70 | $186,956.00 |
| | | **12,480** | | | **$765,082.05** |
| | | | | | |
| SHALALA | 4/5/2006 | 2,000 | A | $61.29 | $122,580.00 |
| | 7/16/2007 | 500 | A | $35.44 | $17,720.00 |
| | | **2,500** | | | **$140,300.00** |
| | | | | | |
| SONNENFELD | 7/16/2007 | 800 | A | $35.44 | $28,352.00 |
| | | **800** | | | **$28,352.00** |
| | | | | | |

| TOTAL: | | 286,357 | | | $15,462,286.54 |
|--------|--|---------|--|--|----------------|

## DAMAGES TO LENNAR CAUSED BY THE INDIVIDUAL DEFENDANTS

76.   As a result of the Individual Defendants' improprieties, Lennar disseminated improper statements concerning its business prospects as alleged above.  These improper statements have devastated Lennar's credibility as reflected by the Company's $8 billion market capitalization loss.

77.   Further, the Individual Defendants directed or allowed Lennar to acquire land and build more inventory in an oversaturated market with falling demand.  Also, during the Relevant period, the Individual Defendants directed or allowed Lennar to make risky loans to unqualified buyers.

78.   As a direct and proximate result of the Individual Defendants' actions, Lennar has lost and will continue to lose significant sums of money.  Such losses include, but are not limited to:

(a)   costs incurred from compensation and benefits paid to the defendants who have breached their duties to Lennar;

(b)   the $3.2 billion in write-downs and valuation adjustments;

(c)   the $2.29 billion in reported losses that the Company has sustained since the fourth quarter of fiscal year 2006; and

(d)   costs incurred from paying inflated prices for its own shares during the Company's share repurchase.

79.   Moreover, these actions have irreparably damaged Lennar's corporate image and goodwill.  For at least the foreseeable future, Lennar will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Lennar's ability to raise equity capital or debt on favorable terms in the future is now impaired.

- 39 -

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

80.     Plaintiff brings this action derivatively in the right and for the benefit of Lennar to redress injuries suffered, and to be suffered, by Lennar as a direct result of breaches of fiduciary duty, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Lennar is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

81.     Plaintiff will adequately and fairly represent the interests of Lennar in enforcing and prosecuting its rights.

82.     Plaintiff is and was an owner of the stock of Lennar during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

83.     The current Board of Lennar consists of the following eight individuals: defendants Miller, Bolotin, Gerard, Landon, Lapidus, Shalala, Sonnenfeld and non-defendant director Sherrill W. Hudson.

84.     Defendant Miller, the President, CEO and a director of the Company, dominates and controls the Board.  Lennar has two different classes of voting stock, Class A common stock and Class B common stock.  Class B common stock has 10 votes per share, while Class A common stock has 1 vote per share.  Miller beneficially owns 1,888,946 shares of Class A stock, 1.4% of the outstanding class, and 21,409,652 shares of Class B common stock, 68.4% of the outstanding Class B stock.  Combined, Miller controls 48.6% of the votes.  Therefore, it would take a near unanimous vote from the remaining stockholders to override Miller's vote giving Miller effective control over the shareholder vote and the election of directors.  This voting dominance gives Miller control over the Board.  Miller has the ability to simply replace any director that does act according to his wishes.  Miller is personally interested in this lawsuit because many of the improper statements made during the Relevant Period were Miller's personal statements.  Further, Miller, as CEO and President of the Company, knew the true state

- 40 -

of the Company's business health and future prospects, yet, still made these improper statements. Thus, Miller faces a substantial likelihood of liability. The Board, however, will not vote to initiate a lawsuit in which Miller faces a substantial likelihood of liability because he controls the Board as detailed above.

85. The principal professional occupation of defendant Miller is his employment as President and CEO of Lennar, pursuant to which he received and continues to receive substantial monetary compensation and other significant personal benefits. Specifically, Lennar paid Miller the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2007 | $1,000,000 | - | $9,950,000 | - | $130,397 |
| 2006 | $1,000,000 | $4,713,200 | - | 200,000 | $7,700 |
| 2005 | $1,000,000 | $21,519,600 | $6,331,500 | 200,000 | $7,400 |
| 2004 | $1,000,000 | $15,190,700 | - | 400,000 | $7,500 |

Accordingly, defendant Miller lacks independence from Landon, Bolotin and Gerard who are not disinterested and/or independent and who exert influence over Miller's compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee has the authority to review and approve Miller's base salary, bonus and equity compensation. This lack of independence renders defendant Miller incapable of impartially considering a demand to commence and vigorously prosecute this action.

86. As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse, non-public information regarding Lennar's true business prospects. While in possession of this material, adverse, non-public information regarding the Company, the following current members of the Lennar Board participated in the illegal insider selling by selling the following amounts:

(a)     while in possession of adverse, non-public information, Miller sold 70,490 shares of Lennar stock for proceeds of $3,699,091.10;

(b)     while in possession of adverse, non-public information, Shalala sold 2,500 shares of Lennar stock for proceeds of $140,300;

(c)     while in possession of adverse, non-public information, Bolotin sold 1,500 shares of Lennar stock for proceeds of $53,180;

(d)     while in possession of adverse, non-public information, Gerard sold 1,410 shares of Lennar stock for proceeds of $84,928.25; and

(e)     while in possession of adverse, non-public information, Sonnenfeld sold 800 shares of Lennar stock for proceeds of $28,352.

(f)     Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested.  Moreover, these defendants face a sufficiently substantial threat of liability for breach of their fiduciary duties for insider selling.  Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

87.     Defendants Landon, Bolotin and Gerard were, during the Relevant Period, members of the Audit Committee.  The purpose of the Audit Committee is set out in the Audit Committee's charter.  The Audit Committee's charter provides that the Audit Committee is responsible for assisting the Board in overseeing the integrity of the Company's financial statements and internal controls.  In furtherance of this purpose, the Audit Committee discusses the annual and quarterly financial statements with the Company's management, as well as discusses the Company's earnings press releases, including financial information and earnings guidance provided to analysts and rating agencies.  Thus, defendants Landon, Bolotin and Gerard were responsible for overseeing and directly participating in the dissemination of Lennar's improper press releases, financial results and guidance.  Further, because the Audit Committee is charged with discussing and reviewing policies with respect to risk assessment and risk management, defendants Landon, Bolotin and Gerard  had a duty to ensure that proper risk

- 42 -

management policies were in place to accurately gauge the Company's exposure to a housing downturn. Accordingly, defendants Landon, Bolotin and Gerard breached their fiduciary duties of due care, loyalty and good faith because they participated in the preparation of improper financial statements and earnings press releases that contained improper material information. Particularly, these defendants reviewed and failed to correct Lennar's improper statements described above. Thus, defendants Landon, Bolotin and Gerard face a sufficiently substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

88.     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

89.     The Director Defendants of Lennar, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Lennar's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

90.     The acts complained of constitute violations of the fiduciary duties owed by Lennar's officers and directors and these acts are incapable of ratification.

91.     Each of the Director Defendants of Lennar authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

92.     Any suit by the current directors of Lennar to remedy these wrongs would likely expose the Individual Defendants and Lennar to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

93.     Lennar has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not

- 43 -

filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Lennar any part of the damages Lennar suffered and will suffer thereby.

94.      Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recovery for Lennar for any of the wrongdoing alleged by plaintiff herein.

95.      Plaintiff has not made any demand on shareholders of Lennar to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)      Lennar is a publicly held company with over 3 billion shares outstanding, and over thousands of shareholders;

(b)      Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)      Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

**Derivatively Against the Director Defendants and Defendant Gross for Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

96.      Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.      During the Relevant Period, the Director Defendants and defendant Gross disseminated or approved public statements that improperly portrayed Lennar's business prospects, growth and margins.  In particular, the Company's strategy did not protect it from a housing downturn and Lennar was actually overexposed to the housing crisis due to acquiring land and creating more inventory in an already oversaturated market.  The Director Defendants and defendant Gross knew that the Company's public statements concerning its business prospects were misleading and intended to deceive, manipulate and/or defraud in connection therewith.

- 44 -

98. The Insider Selling Defendants also sold over $15 million worth of shares of Lennar's common stock at inflated prices during the Relevant Period while in possession of material non-public information. These defendants misappropriated Lennar's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold Lennar stock without disclosing the information alleged to have been concealed herein.

99. At the same time the price of the Company's common stock was inflated due to the improper reporting of the value of Lennar's business prospects, especially concerning the Company's exposure to the housing market crisis, and the Insider Selling Defendants were selling stock into the market, the Director Defendants and defendant Gross were causing Lennar to repurchase over $365 million worth of its own stock on the open market at an average inflated price.

100. As such, the Director Defendants and defendant Gross violated § 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

        (a) employed devices, schemes and artifices to defraud;

        (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lennar and others in connection with their purchases of Lennar common stock during the Relevant Period.

As a result of the Director Defendants' and defendant Gross' misconduct, Lennar has and will suffer damages in that it paid artificially inflated prices for Lennar common stock purchased on the open market. Lennar would not have purchased Lennar common stock at the prices it paid, had the market previously been aware that the market price of Lennar's stock was artificially and falsely inflated by the misleading statements. As a direct and proximate result of the wrongful conduct of the Director Defendants and defendant Gross, Lennar suffered damages in connection with its purchases of Lennar common stock during the Relevant Period. By reason of such conduct, the Director Defendants and defendant Gross are liable to the Company pursuant to § 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Derivatively Against Defendants Miller, Gross, Landon, Bolotin and Gerard for Violation of § 20(a) of the Exchange Act

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    Defendant Miller, Lennar's Chairman and CEO, defendant Gross, Lennar's CFO, and defendants Bolotin, Landon and Gerard, as members of the Audit Committee, directly or indirectly controlled or induced the Individual Defendants who violated § 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

103.    These defendants are jointly and severally liable to the same extent as the Individual Defendants under § 20(a) of the Exchange Act.  These defendants did not act in good faith.

## COUNT III

### Against Individual Defendants for Breach of Fiduciary Duty

104.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.    The Individual Defendants owed and owe Lennar fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Lennar the highest obligation of good faith, fair dealing, loyalty and due care.

106.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of good faith, fair dealing, loyalty and due care.

107.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the Company's business prospects and financial results.  The Individual Defendants also had actual or constructive knowledge that they were improperly causing Lennar to repurchase over $365 million of its own stock at artificially inflated prices.  Further, the Individual Defendants had actual or constructive knowledge that housing demand was falling and the market was oversaturated.  Despite these facts, the

Individual Defendants caused or allowed Lennar to acquire more properties and build more inventory without sufficient demand.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

108.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Lennar has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

109.    Plaintiff, on behalf of Lennar, has no adequate remedy at law.

### COUNT IV

**Against the Insider Selling Defendants for Breach of Fiduciary
Duties for Insider Selling and Misappropriation of Information**

110.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Lennar common stock on the basis of such information.

112.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Lennar common stock.

113.    At the time of their stock sales, the Insider Selling Defendants knew that the Company was over exposed to the housing market downturn.  The Insider Selling Defendants' sales of Lennar common stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

114.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT V

### Against Individual Defendants for Breach of Fiduciary Duty for Abuse of Control

115.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Lennar, for which they are legally responsible.  In particular, the Individual Defendants abused their positions of authority by causing or allowing Lennar to issue statements that improperly portrayed Lennar's business prospects and health, including failing to mention the Company's over-exposure to a housing market downturn.  Further, the Individual Defendants caused or allowed Lennar to acquire more land and create more inventory without sufficient demand.

117.    As a direct and proximate result of the Individual Defendants' abuse of control, Lennar has sustained significant damages.  These damages include, but are not limited to, Lennar's severe loss of market credibility as reflected in its $8 billion market capitalization loss, the $3.2 billion in write downs and valuation adjustments, the $2.29 billion in reported losses since the fourth quarter of fiscal year 2006, and $365 million paid to repurchase the Company's stock.

118.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

119.    Plaintiff, on behalf of Lennar, has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Breach of Fiduciary Duty for Gross Mismanagement

120.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties

- 48 -

with regard to prudently managing the assets and business of Lennar in a manner consistent with the operations of a publicly held corporation.

122.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Lennar has sustained significant damages. These damages include, but are not limited to, Lennar's severe loss of market credibility as reflected in its $8 billion market capitalization loss, the $3.2 billion in write downs and valuation adjustments, the $2.29 billion in reported losses since the fourth quarter of fiscal year 2006 and $365 million paid to repurchase the Company's stock

123.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

124.    Plaintiff, on behalf of Lennar, has no adequate remedy at law.

## COUNT VII

### Against All Defendants for Waste of Corporate Assets

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, paying $365 million to repurchase the Company' stock and paying bonuses to certain of its executive officers.

127.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

128.    Plaintiff, on behalf of Lennar, has no adequate remedy at law.

## COUNT VIII

### Against Individual Defendants for Unjust Enrichment

129.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

130.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Lennar.  Their unjust enrichment includes, but is not limited to, the $15 million of proceeds from insider sales and compensation and benefits paid to the Individual Defendants.

131.   Plaintiff, as a shareholder and representative of Lennar, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.   Declaring the Director Defendants and defendant Gross are liable under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and that defendants Miller, Gross, Bolotin, Landon and Gerard are jointly and severally liable under § 20(a) of the Exchange Act and awarding Lennar damages;

C.   Directing Lennar to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Lennar and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of Lennar to nominate at least three candidates for election to the Board;

3.      a proposal to ensure the accuracy of the qualifications of Lennar's directors, executives and other employees;

4.      a proposal to control insider selling;

5.      a proposal to ensure that Lennar prudently expends funds in stock repurchase programs;

6.      a proposal to better manage and disclose Lennar's market risks; and

7.      a proposal to appropriately test and then strengthen the internal audit and control functions.

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Lennar has an effective remedy;

E.      Awarding to Lennar restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

- 51 -

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: April **11**, 2008

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS, LLP
PAUL J. GELLER
FLORIDA BAR NO. 984795
pgeller@csgrr.com
DAVID J. GEORGE
FLORIDA BAR NO. 0898570
dgeorge@csgrr.com

            DAVID J. GEORGE

120 E. Palmetto Park Road, Suite 500
Boca Raton, Florida  33432
Telephone: (561) 750-3000
Facsimile:  (561) 750-3364

ROBBINS UMEDA & FINK, LLP
MARC M. UMEDA
STEVEN J. SIMERLEIN
JILL E. KLEMANN
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

Attorneys for Plaintiff

<u>VERIFICATION</u>

I, Doris Staehr, have read the Lennar, Corp. Verified Shareholder Derivative Complaint and know the contents thereof.  The Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_____4/7/08_____

_____
DORIS STAEHR

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

DORIS STAEHR, Derivatively On Behalf of LENNAR CORPORATION

**DEFENDANTS**

STUART A. MILLER, BRUCE E. GROSS, et al., AND LENNAR CORPORATION, a Delaware corporation, NOMINAL

**(b)** County of Residence of First Listed Plaintiff   Santa Rosa
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   MIAMI-DADE
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Coughlin Stoia Geller Rudman & Robbins LLP
120 East Palmetto Park Road, Ste. 500
Boca Raton, FL 33432  (561) 750-3000

Attorneys (If Known)

1:08 CV 20990 PAS/JJO

**(d)** Check County Where Action Arose: ☑ MIAMI-DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☑ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☐ NO      b) Related Cases ☐ YES ☐ NO

JUDGE _____   DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

Violations of the Securities Exchange Act of 1934

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE   April 11, 2008

**FOR OFFICE USE ONLY**

AMOUNT _____   RECEIPT # _____   IFP _____