UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 08-20990-CIV-JORDAN

DORIS STAEHR, Derivatively On Behalf of   )
LENNAR CORPORATION                        )
                                          )
            Plaintiff                     )
                                          )
vs.                                       )
                                          )
STUART A. MILLER, et al.                  )
                                          )
            Defendants,                   )
-and-                                     )
                                          )
LENNAR CORPORATION,                       )
                                          )
            Nominal Defendant             )
_____)

### ORDER GRANTING MOTION TO DISMISS

For the reasons set forth below, the defendants' motions to dismiss the second amended complaint [D.E. 80, D.E. 81] are GRANTED.

### I. BACKGROUND

This is a derivative shareholder suit brought by Ms. Staehr against officers and directors of Lennar Corporation, which is incorporated in Delaware. Ms. Staehr asserts violations of §§ 10(b) and 20(a) of the Exchange Act, as well as various state law claims, based on alleged misconduct by the defendants between September 1, 2005, and June 30, 2008.

During this relevant period, Lennar was the nation's third largest homebuilder selling and developing residential real estate. Lennar also operated financial services subsidiaries, offering mortgage loans to their customers. *See* Second Amended Complaint at ¶7 [D.E 76]. Lennar's President and CEO, Stuart Miller, has owned a controlling stake in Lennar since 2002, and currently holds 46.8 percent of the voting rights in the company. Bruce E. Gross, Donna E. Shalala, Steven L. Gerard, Irving Bolotin, Jeffrey Sonnenfeld, Sidney Lapidus and R. Kirk Landon all serve on the Board of Directors for Lennar. Diane J. Bessette is currently Lennar's treasurer, and served as

1

Lennar's controller from 1997 to February 2008.

The gravamen of Ms. Staehr's complaint is that the defendants took a recklessly aggressive path in the pursuit of record profits in 2006. The complaint further alleges that the defendants turned a blind eye to what she describes as the signs of an obvious and imminent collapse of the real estate market, and that the defendants were reckless in failing to limit Lennar's exposure in the event that the real estate bubble burst.

## II. LEGAL STANDARD

### A. HEIGHTENED PLEADING STANDARD

The pleading standard for a general complaint, defined by Rule 8(a)(2), merely requires "a short and plain statement of the claim showing that the pleader is entitled to relief" with sufficient specificity that the claims rise above the speculative level. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). In securities litigation, however, the pleading standard is heightened by Rule 9(b) and the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4.

In order to survive a motion to dismiss, a plaintiffs' claim of securities fraud must satisfy the requirements of Rule 9(b), which requires all allegations of fraud to be stated with particularity. "Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud. A sufficient level of factual support for a [§ 10b] claim may be found where the circumstances of the fraud are pled in detail. This means the who, what, when where, and how: the first paragraph of any newspaper story." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citations omitted).

Under the PSLRA, in addition to satisfying the particularity requirement of Rule 9(b), the plaintiff must also "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all the facts on which the belief is formed." *See* 15 U.S.C § 78u-4(b)(1)(B). Also, for each alleged misrepresentation, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind." *See id.* "Moreover the complaint must allege facts supporting a strong inference of scienter for each defendant with respect to each violation." *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1278 (S.D. Fla. 2008) (citing *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008)). If either requirement is not met, the complaint must be dismissed. *See* § 78u-4(b)(3)(a); *Hubbard*, 625 F. Supp. 2d at 1278 (citation omitted).

### III. DISCUSSION

#### A. DEMAND FUTILITY

Ms. Staehr's claims are all brought derivatively on behalf of Lennar. Ms. Staehr, however, did not make a demand on Lennar. Rather, she claims that demand was futile because the board of directors was dominated by Mr. Miller and incapable of considering her request, and that a majority of the directors faced a substantial likelihood of liability.

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."*Stepak v. Addison*, 20 F.3d 398, 401 (11th Cir. 1994), citing *Aronson v. Lewis*, 473 A.2d 805, 811 (Del.1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Because shareholder derivative suits restrict a board's managerial authority, "as a prerequisite to a shareholder's derivative suit" an aggrieved shareholder must either "demand the board to take the desired action," *see Spiegel v. Buntrock*, 571 A.2d 767, 772-73 (Del. 1990), or "plead that demand is excused because futile." *See Stepak*, 20 F.3d at 401 citing *Levine v. Smith*, 591 A.2d 194, 200 (Del. 1991). Rule 23.1 of the Federal Rules of Civil Procedure, and the materially identical Delaware Chancery Court Rule 23.1, require that a derivative plaintiff "satisfy more stringent pleading requirements" than Rule 8 allege "with particularity" the reasons why demand is futile. *See Stepak*, 20 F.3d at 402. Demand is excused only where there is reasonable doubt that the majority of the directors could not "impartially consider the demand," such as where a majority shareholder dominates and controls each director or where there is a "substantial likelihood [of each] director['s] liability." *See Aronson*, 473 A.2d at 807, 815. In this case, as explained below, Ms. Staehr fails to allege with particularity that Lennar's board could not impartially consider a demand because it was dominated by Mr. Miller or that each director faces a substantial likelihood of liability. Therefore, demand is not futile and the complaint must be dismissed.

### 1. INSUFFICIENT ALLEGATIONS THAT DEMAND IS FUTILE BASED ON DOMINATION OF THE BOARD BY MR. MILLER

The complaint asserts that Mr. Miller dominates and controls the board of directors, controls 48.7 percent of the voting control, serves on the board's two-member "Executive Committee," and that the board approved a series of transactions between Lennar and LNR in 1997 and 2004 that brought Mr. Miller personal benefit.[1] In addition, the complaint alleges that Mr. Bolotin lacks independence because he was employed by Lennar for the duration of his career, that Mr. Lapidus lacks independence because he presided over the Independent Directors Committee (which approved Miller's allegedly self-interested transactions), and that Ms. Shalala lacks independence because the Miller family donated $ 100 million to the University of Miami while she served as president of that institution.

Mr. Miller's voting control and official authority, absent other particularized allegations of domination, do not raise a "reasonable doubt" that four of Lennar's seven independent directors "were interested or controlled." *See Aronson*, 473 A.2d at 812. "[S]tock ownership alone, at least when it amounts to less than a majority, is not sufficient proof of domination or control." *See Aronson*, 473 A.2d at 815 citing *Kaplan v. Centex Corp.*, 284 A.2d 119, 123 (Del. Ch. 1971). Furthermore, the presumption of director independence is not overcome merely because such voting control is coupled with "official decision making authority." *See In re Trump Hotels S'Holder Derivative Litig.*, 2000 WL 1371317, at *7 (S.D.N.Y. 2000). As a result, Mr. Miller's plurality ownership of Lennar and his role on the Executive Committee (a delegation of authority sanctioned by Delaware's General Corporate Law § 141(c)) do not show that a majority of the board members could not impartially consider a demand. In addition, the series of transactions between Lennar and LNR in 1997 and 2004 that allegedly benefitted Mr. Miller are "conclusory" and insufficient to show

---

[1] The complaint also alleges that Mr. Miller's domination and control is demonstrated by the director defendants' failure to pursue legal remedies against those responsible for Lennar's losses. This "bare claim" absent particularized facts "raises no legally cognizable issue under Delaware corporate law." *Aronson*, 473 A.2d at 817. *See also Kaltman v. Sidhu*, 2004 WL 357861, at *5 (N.D. Tex. 2004) ("The mere fact that [the Board] has elected not to sue before the derivative action was filed should not of itself indicate 'interestedness.'"), quoting *Richarson v. Graves*, 1983 WL 21109, at *3 (Del. Ch. 1983).

board domination without "specific facts detailing why board members lacked independence or were beholden to [the board member] with respect to the challenged transaction." *See id*.

Similarly, allegations that Mr. Lapidus is dominated because he worked closely with Miller as a member of board committees and approved the allegedly self-interested transactions are "conclusory." They are therefore insufficient to show domination. *See In re Trump Hotels S'Holder Derivative Litig.*, 2000 WL 1371317, at *7 (claims that a board member approved a transaction that benefitted the allegedly dominant member, combined with benefits from board service, do not show that the board member was incapable of executing "independent judgment").

The complaint's allegations that Mr. Bolotin is dominated by Mr. Miller also fail. A "mere personal friendship or . . . [a] business relationship" is "insufficient to raise a reasonable doubt about a director's independence." *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004) (finding that a close personal relationship, including familial social interactions do not show a lack of independence). The claim that Mr. Bolotin has worked for Lennar his entire career and, as a result, owes loyalty to the Miller family, without particularized allegations showing that this loyalty affects his judgment, does not raise a reasonable doubt about Mr. Bolotin's independence. *See id*. Furthermore, Mr. Bolotin's receipt of director's fees, without allegations that such fees exceed customary bounds, is not sufficient to show domination. *See A.R. DeMarco Enter., Inc. v. Ocean Spray Cranberries, Inc.*, 2002 WL 31820970, at *5 n.13 (Del. Ch. 2002), citing *Grobow v. Perot*, 539 A.2d 180,188 (Del.1988).

There are reasonable doubts, however, that Ms. Shalala could consider a demand. The complaint alleges that the influence of the Miller family was instrumental in Ms. Shalala being appointed as the president of the University of Miami, that the Miller family gave a $ 100 million donation to the University while Ms. Shalala was president, and that Mr. Miller currently serves on the University's Board of Trustees with Ms. Shalala. I do not find that Ms. Shalala acted improperly, or that she was interested or controlled, but rather conclude only that the allegations raise doubts about her independence. *See Lewis v. Fuqua*, 502 A.2d 962, 967 (Del. Ch. 1985) (President of Duke University lacked independence because the president of the corporation subject to the suit served as a trustee of Duke and gave several contributions to Duke); *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 359 (Del. Ch. 1998) (finding that interlocking directorship combined with donations

5

"would likely lead to a reasonable doubt of [a university president's] independence"). The reasonable doubt concerning Ms. Shalala's independence does not excuse a demand, however, because Ms. Staehr has the burden of alleging that the *majority* of directors were dominated or controlled. *See Aronson*, 473 A.2d at 812. Because the allegations fail to show that six of the seven independent directors were dominated or controlled by Mr. Miller, demand is not excused on this basis.

### 2. Insufficient Allegations that Demand is Futile Because of a Substantial Likelihood of Each Director's Liability

Demand is also futile where there is a substantial likelihood that the majority of directors will face liability. *See id.* at 815. In this case, demand is not excused because the complaint does not allege particularized facts showing that any of the defendants (i) violated Rule 10b-5; (ii) violated § 20(a) of the Exchange Act; (iii) breached their fiduciary duties; (iv) wasted corporate assets; or were (v) unjustly enriched.

### I. Derivative Claim Against Mr. Miller and Mr. Gross for a Rule 10b-5 Violation

To state a securities fraud claim under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must show: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on a misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'"*See Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 945, 952 (11th Cir. 2010), quoting *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341-42 (2005). The complaint alleges that Mr. Miller and Mr. Gross violated Rule 10(b)(5) because they caused Lennar to repurchase stock to artificially inflate the share's price. Ms. Staher's claim fails because Lennar's Board of Directors approved the stock repurchases at issue, negating reliance and loss causation, and because she has not properly alleged that Mr. Miller and Mr. Gross acted with the requisite scienter in causing the repurchases.

### a. Approval of Repurchase by Majority of Board Negates Reliance and Loss Causation

Approval of stock repurchases by a "disinterested majority of the board possessing authority to act and fully informed of all relevant facts will suffice to bar a Rule 10b-5 claim that the corporation or its stockholders were deceived." *See In Re Citigroup Inc. S'holder Derivative Litig.*, 2009 WL 2610746, at *10 (S.D.N.Y. 2009) citing *Maldonado v. Flynn*, 597 F.2d 789, 793 (2d Cir.

6

1979). *See also Ray v. Karris*, 780 F.2d 636, 641 (7th Cir. 1985) (citing *Maldonado* approvingly and asserting that knowledge of the corporation will turn on whether disinterested majority of directors approved the transaction at issue). When a disinterested majority of the board approves a transaction, the plaintiff cannot demonstrate that the shareholders were deceived "because the knowledge of the disinterested majority in such event must be attributed to the corporation and its stockholders." *See Maldonado*, 597 F.2d at 793.[2] Furthermore, a member of the board of directors is considered "disinterested" if he or she lacks a financial stake in the transaction under consideration. *See id*. As a result, a plaintiff cannot show a Rule 10b-5 violation where the claim is based on a transaction approved by the board, and there are no allegations (a) that the board members were not informed of the relevant facts and (b) the board members were not personally interested in the transaction, or controlled by an interested party.

In this case, the complaint expressly alleges that the audit committee "reviewed and approved earnings releases, earnings guidance and financial statements," and had access to the negative data

---

[2] The Eleventh Circuit has not yet addressed whether approval by a disinterested, fully-informed majority of board members of a transaction bars a Rule 10b-5 claim, but I believe that the Eleventh Circuit would follow the Second Circuit's approach.

First, the Eleventh Circuit has noted, in dicta, that as a general rule, "if the corporation's officers or agents are not deceived, the corporation is not deceived, and a claim is not stated under section 10(b) and Rule 10b-5." *See Shell v. Hensley*, 430 F.2d 819, 826 (5th Cir. 1970). The decision in *Ala. Farm Bureau Mut. Cas. Co., Inc. v. Am. Fidelity Life Ins. Co.*, 606 F.2d 602, 613 (5th Cir. 1979), does not reach a contrary result. That case held that a derivative Rule 10b-5 claim based on a stock repurchase was cognizable where the plaintiff adequately alleged that some or all the directors authorized stock repurchase to perpetuate management's control. *See id*. In this case, the complaint does not make particularized allegations that Mr. Miller or Mr. Gross authorized the stock repurchase plan for any personal benefit.

Second, it is well-established that a corporation is charged with the knowledge of agents, including the board of directors, acting on its behalf. *See Curtis, Collins & Holbrook Co. v. United States*, 262 U.S. 215, 222-23 (1923). In addition, § 10(b) "is not an all-purpose breach of fiduciary duty ban," rather its application is limited to "conduct involving manipulation or deception." *See S.E.C. v. Yun*, 327 F.3d 1263, 1278 (11th Cir. 2003). If a disinterested majority of the board of directors approved a transaction with full knowledge, especially where there are no particularized allegations that any director was personally interested in the transaction, this knowledge is appropriately attributed to the corporation itself, and defeats a derivative Rule 10b-5 claim because the corporation cannot show that it relied on any misrepresentation or that such a misrepresentation caused a loss.

regarding sales, orders, cancellations, as well as broader market conditions, when it approved the stock repurchases at issue pursuant to the board of director's 2001 authorization. *See* Second Amended Complaint at ¶¶ 21, 98, 193. The complaint also alleges that the independent director defendants were provided financial information by the audit committee, and were aware of misleading earnings projections and risk assurances, when they permitted the repurchase of the shares. *See id.* at ¶¶ 12, 179-183. These allegations are sufficient to show that the audit committee members and the independent director defendants were fully informed of all the relevant facts when they approved the share repurchase transactions on behalf of Lennar.

In addition, the complaint does not allege that any of the board members had a personal interest in, or were dominated by an individual with a personal interest in, the share repurchases. A director is disinterested when he does not "expect to derive any personal benefit" from the transaction "in the sense of self-dealing-as opposed to a benefit which devolves upon the corporation or all stockholders generally." *See United States v. De La Mata*, 266 F.3d 1275, 1297 (11th Cir. 2001). The complaint alleges that Mr. Miller's and Mr. Gross' motive in seeking the stock repurchase was to "halt the stock's slide" and "signal[ ] management confidence in the stock." *See* Second Amended Complaint at ¶¶ 99-102. There are no allegations that any of the board members would gain individual financial benefit from the stock.[3] The board members were therefore "disinterested" in the stock repurchase transaction, and their knowledge of Lennar's underlying financial conditions, including whether the stock was overvalued by any alleged misrepresentations made by Mr. Miller and Mr. Gross, is properly attributable to Lennar.

Ms. Staehr's Rule 10b-5 claim is premised upon the stock repurchases because the repurchases are the "connection with the purchase or sale of a security." As a result, she cannot demonstrate the fourth or sixth elements of a Rule 10b-5 claim: reliance and "loss causation." The

---

[3] The allegation that Mr. Miller's domination and control of the board made it unable to consider a shareholder demand is distinct from an allegation that Mr. Miller had a personal interest in the stock repurchase, combined with domination of the board, prevented the board from fairly considering the stock repurchase transaction. Only an allegation that the board was "dominated by an individual [personally] interested in the transaction" is relevant to the analysis of whether the board of directors fairly considered the stock repurchase transaction. *See In Re Citigroup Inc.*, 2009 WL 2610746, at *10.

8

board of director's knowledge of Lennar's financial condition, and knowledge of any misstatements or omission made in financial guidance or by Mr. Miller or Mr. Gross, is imputed to Lennar. Therefore, Ms. Staehr's Rule 10b-5 claim fails.

### b. INSUFFICIENT ALLEGATIONS THAT MR. MILLER AND MR. GROSS ACTED WITH SCIENTER IN CAUSING THE REPURCHASES

The Rule 10b-5 claim also fails because the complaint fails to allege scienter with adequate particularity. The complaint asserts that Mr. Miller and Mr. Gross violated Rule 10b-5 through an "act that operated as a fraud or deceit" when they caused Lennar to repurchase stock that was artificially inflated by their misrepresentations and omissions. Under the PSLRA, a plaintiff must allege sufficient facts to show that the that the defendant acted with a certain scienter -- an intent to deceive -- in causing the stock repurchases. *See* 15 U.S.C. § 78u-4(b)(1)(B). The complaint alleges that Mr. Miller and Mr. Gross:

> knowingly and willfully made and caused the publication of misleading statements regarding Lennar's future business prospects and present financial condition, and knowingly, willfully, and acting with scienter caused Lennar to repurchase 6,996,000 shares of its own stock . . . when they knew that Lennar's stock was substantially artificially inflated due to their misleading statements. The repurchases of Lennar stock were intended to and did manipulate and/or deceive Lennar and its shareholders.

*See* Second Amended Complaint at ¶ 201 [D.E. 76].

Ms. Staehr's allegations that Mr. Miller and Mr. Gross acted with intent to deceive in making misleading statements do not match her allegation of securities fraud. *See Goodman*, 594 F.3d at 955 (finding that allegations showing that a defendant acted with scienter must "match" the fraud that the plaintiffs allege).[4] When a derivative Rule 10b-5 claim is based on a corporation's stock

---

[4] Furthermore, Rule 10b-5 requires that the fraudulent conduct share a "nexus" and be "in connection with" the purchase or sale of a security. *See Buffo v. Graddick*, 742 F.2d 592, 596 (11th Cir. 1984). To determine whether this requirement is met, a court considers factors such as "the degree of proximity between the securities transaction and the claimed fraud" and "whether there was a causal connection between the fraud and the securities transaction." *See id*. In this case, the complaint's assertion that the stock price was inflated by misrepresentations does not show a "nexus" between the misrepresentations and the repurchase because the misrepresentations do not make the repurchase deceptive. Rather, it is the repurchase itself that is alleged to be deceptive because it further inflated the stock price. As a result, the alleged misrepresentations are not "in connection with" the purchase or sale of a security for the purpose of analyzing Ms. Staehr's Rule

repurchase plan, the defendant must have the intent to deceive the shareholders through the stock repurchase plan itself. *See Ala. Farm*, 606 F.2d at 613 (discussing Rule 10b-5 claim based on "the defendants' failure to disclose that the repurchase plan was to be carried out in a manner that would artificially inflate the price of [the corporation's] stock"). Therefore, in this case, a Rule 10b-5 claim based on a stock repurchase requires allegations that Mr. Miller and Mr. Gross intended to deceive shareholders by causing the repurchase. Yet the complaint asserts that the purpose of the stock repurchase was to "signal[] to the market that the stock was undervalued" and "halt the stock's slide during the quarter following the widely publicized reports of falling home sales." *See* Second Amended Complaint at ¶ 99. Furthermore, the complaint claims that Mr. Miller and Mr. Gross intended to mislead shareholders about Lennar's value, demonstrated by the fact that Lennar admitted that the market slowdown was adversely affecting earnings only one quarter after a press release stating that Lennar "repurchased 5.0 million shares of stock while at the same time maintaining a strong and liquid balance sheet" and that Lennar's "operating strategy and strong balance sheet should enable us to respond to these changing [market] conditions." *See id*. at ¶¶ 100-101.

These bare allegations of motive are insufficient to show scienter. *See Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994) ("It is well established that bare allegations of motive and opportunity will not suffice to demonstrate scienter because, to hold otherwise, 'would effectively eliminate the state of mind requirement as to all corporate officers and defendants.'"). To withstand a motion to dismiss, a plaintiff like Ms. Staehr must make allegations that provide a "strong inference" that is "more than merely 'reasonable' or 'permissible'" that the defendant acted with the intent to defraud the corporation or with "severe recklessness." *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238-39 (11th Cir. 2008) citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *See id*.

The complaint's allegation that the purpose of the stock repurchase was "to halt the stock's

---

10b-5 claim.

10

slide," unsupported by any particularized facts showing that Mr. Gross and Mr. Miller had such a motive, are insufficient to allege that Mr. Miller or Mr. Gross intended to deceive Lennar's shareholders through the repurchases. *Id*. The press release stating that Lennar's "operating strategy," including the stock repurchase, and Lennar's "strong balance sheet" would allow Lennar to respond to changing market conditions helps to refute, rather than support, a showing of scienter because it articulates a motive that is more plausible than one of deceit: amidst market instability, based on the information before them, Mr. Miller and Mr. Gross believed that investing in Lennar was a good business decision when it was possible to maintain a positive balance sheet. *Id*. This explanation is consistent with the typical motive for a corporation to repurchase its own stock: the corporation believes that the stock is undervalued. *See Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734, at *8 (N.D. Cal. 1994) (finding that a stock repurchase plan negates scienter because it "would have made no sense . . . if the defendants knew the prices to be inflated").

The absence of scienter is also supported by Mr. Miller's ownership of 48.7 percent of Lennar, as Mr. Miller himself loses nearly fifty cents for every dollar lost by Lennar (in terms of share price). This makes it less plausible that Mr. Miller would intentionally inflate Lennar's stock values and waste corporate capital on repurchasing stock inflated by his own misstatements, when the repurchase would cause a substantial personal financial loss. In addition, there is no allegation that the defendants made suspicious stock sales "calling into question the alleged motive to artificially inflate the stock price." *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 868 (5th Cir. 2003). As a result, Ms. Staehr fails to adequately allege scienter.

Because scienter, reliance, and loss causation are inadequately plead, Ms. Staehr's Rule 10b-5 claim fails.

## II. CLAIM AGAINST ALL DIRECTOR DEFENDANTS FOR VIOLATION OF § 20(a) OF THE EXCHANGE ACT

Ms. Staehr alleges that the nominal defendants, along with Mr. Miller and Mr. Gross, are liable as "control persons" under § 20(a) of the Exchange Act, 15 U.S.C. § 78t, because they controlled or influenced Lennar's general affairs in a manner that violated Rule 10b-5. The statute provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] . . . shall also be liable jointly and severally with and to the same extent as such controlled person." § 78t(a). "Control person" liability is derivative liability and

requires the plaintiff to show "that the controlled person (not the controlling person) violated the federal securities laws." *See Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 722 (11th Cir. 2008). In this case, the controlled persons include Mr. Miller and Mr. Gross. *See id*. Because Ms. Staehr fails to adequately allege a Rule 10b-5 claim, or any other violation of federal securities laws, there is no "control person" liability because there are no sufficient claims that Lennar violated federal securities laws.

### III. STATE LAW CLAIM FOR BREACH OF FIDUCIARY DUTY

The complaint alleges that the defendants breached their duties of loyalty and care under Delaware law (a) by misrepresentations and omissions in press releases, SEC filings, earnings projections and asset impairments; (b) for failing to disclose Lennar's unique vulnerability to a downturn and to oversee Lennar's reporting systems and controls; and (c) for authorizing the stock repurchases. As discussed above, demand is excused where a majority of the directors face a substantial likelihood of liability. *See Aronson*, 473 A.2d at 815. In this case, the complaint must allege "with particularity" that four of the seven independent directors face a substantial likelihood of liability based on violations of their fiduciary duties. *See Stepak*, 20 F.3d at 402.

Directors are protected from liability for breaches of fiduciary duty by the business judgment rule. The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was take in the best interests of the company." *See Aronson*, 473 A.2d at 812. In addition, Lennar adopted a provision in its certificate of incorporation under Del. Code. Ann. 8.1, § 102 that exculpates directors from liability for violations of fiduciary duty, except for breaches of the duty of loyalty, actions or omissions not in good faith, international misconduct, or knowing violations of the law. *See* Nominal Defendants' Motion to Dismiss at 7 [D.E. 81]; *In re Citigroup Inc. S'holder Litig.*, 964 A.2d 106, 124 (Del. Ch. 2009). A substantial likelihood of liability for a violation of a fiduciary duty, therefore, may only be found where the plaintiff has plead "particularized facts" showing that the directors engaged in bad faith conduct. Bad faith conduct requires a showing of scienter, "actual or constructive knowledge that [the directors'] conduct was legally improper."[5] *Id*. at 124-25 *citing*

---

[5] Ms. Staehr's claim that the independent directors each violated their duty of care is expressly

*Wood*, 953 A.2d 136, 141 (Del. 2008). Because the complaint has not alleged with particularity that the independent directors acted with scienter, it fails to meet this burden.

The complaint alleges that the independent directors serving on the audit committee acted in bad faith and breached their duty of loyalty by failing to provide adequate disclosure and oversight in their review and approval of false and misleading financial statements, impairment charges, earnings releases, earnings guidance, and press releases.[6] To show that a director faces a substantial likelihood of liability for a breach of the duty of disclosure, the plaintiff must allege, among other things, particularized facts that "reasonably suggest sufficient board involvement in the preparation of disclosures" and that the director defendants "had knowledge that any disclosures or omissions were false or misleading or that the director defendants acted in bad faith in not adequately informing themselves." *See Citigroup*, 964 A.2d at 134. A director's membership on a committee that is charged with reviewing and ensuring the accuracy of financial statements does not allow the court to infer the director's state of mind based on this responsibility alone because liability is not measured by the "aspirational standard" established by internal delegations of oversight responsibilities, but by the director's actual state of mind. *See id*. at 135. Furthermore, directors are "fully protected in relying in good faith on the reports of officers and experts." *See Citigroup*, 964 A.2d at 132 (citing 8 Del. C. § 141(e)).

---

precluded by the exculpatory provision.

In addition, to allege a breach of the duty of oversight, the plaintiff must show that the independent directors acted with scienter and (a) "utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *See Citigroup*, 964 A.2d at 123, citing *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). The complaint alleges only that the independent directors consciously failed to monitor Lennar's information systems or controls by failing to prevent misrepresentations regarding Lennar's earning prospects and financial reports and that Lennar's corporate governance guidelines "charged the Director Defendants with understanding and monitoring Lennar's business strategies and their major risks." *See* Second Amended Complaint at ¶¶ 173(a); 175-89, 196-98. Because, as discussed below, such conclusory allegations of directors' general corporate duties and general "red flags," do not show "bad faith" defined as "indolence . . . so persistent that it could not be ascribed to anything other than a knowing decision" to violate the law, Ms. Staehr has failed to state a claim for a breach of the duty of oversight. *See Citigroup*, 964 A.2d at 123 n.47.

[6] For the reasons stated earlier, I do not find that Ms. Staehr has made sufficient allegations that any of the directors had scienter in approving the stock repurchases.

13

In this case, taking the complaint's allegations as true, the three audit committee members met twelve times in 2005 and 2006, and eleven times in 2007, and were responsible for reviewing Lennar's financial reports and earnings guidance and supervising risk assessment and risk management. ¶¶ 190 – 193. As a result of this delegation of responsibility, the audit committee's "role . . . made them aware of the major risks to Lennar and the evidence that the risks identified in 2005 had become a reality in 2006." *Id*. at ¶ 193. Furthermore, Mr. Miller told shareholders that the audit committee would review the Lennar's financial statements including asset balances prior to their public release. *Id.* at ¶ 119.[7]

The conclusory allegations that the audit committee has the responsibility to review and approve financial statements and press releases -- and did review earnings projections such as the asset impairments -- is not sufficient to infer that the audit committee defendants were aware of any misstatements or omissions contained in these documents. *See Citigroup*, 964 A.2d at 134. *See also Wood*, 953 A.2d at 142 (finding that allegations that directors served on the audit committee, executed public financial reports that improperly valued corporate assets, approved transactions, and were aware of other "red flags" do "not plead with particularity the specific conduct in which each defendant 'knowingly' engaged, or that the defendants knew such conduct was illegal").[8] These

---

[7] The complaint's allegations regarding the knowledge of the independent director defendants who were not on the audit committee are even less specific than the allegations of the knowledge of the audit committee defendants. As a result, my finding that the complaint fails to allege with particularity that the audit committee defendants acted in bad faith applies equally to the other independent director defendants.

[8] Contrary to Ms. Staehr's assertion, *Pfeffer v. Redstone*, 965 A.2d 676, 687 (Del. 2009), and *Guttman v. Huang*, 823 A.2d 492, 503 (Del. Ch. 2003), do not support a finding that scienter has been adequately alleged in this case. *Pfeffer* held that the plaintiff had not sufficiently plead scienter because claims that directors "would (or must) have been told" material information without "facts to support that inference" were merely conclusory. *Guttman* found that a complaint lacked detailed allegations regarding the roles of directors and the information they reviewed in these roles, as well as "any indication as to why they would have perceived the . . . irregularities," but did not expressly find that such detail would be sufficient to show scienter.

The complaint identifies a series of allegedly deceptive public statements made by Mr. Miller that the audit committee defendants "continued to permit," including the 2007 "admission" that Lennar adjusted its strategy in early 2006. *See, e.g.*, Second Amended Complaint at ¶¶ 89, 94, 95, 128. It is unclear, however, whether the director defendants actually approved or knew of these statements and, as a result, they cannot contribute to a finding of scienter. *See Pfeffer*, 965 A.2d at

responsibilities are not particularized allegations of board involvement in preparation of the allegedly false or misleading reports sufficient to infer scienter. Furthermore, the absence of scienter is supported by the fact that the director defendants are fully protected for relying in good faith on any reports prepared by Mr. Miller and Mr. Gross, or Ms. Bessette. *See Citigroup*, 964 A.2d at 132 (citing 8 Del. C. § 141(e)).

The alleged "red flags" and access to internal real time market data do not provide particularized facts to overcome this presumption of good faith. First, "[s]igns of problems" in the credit and coastal homebuilding markets discussed in publications, *see, e.g.*, Second Amended Complaint at ¶¶ 65, 66, 69, 70, 91, amount to "nothing more than indications of worsening economic conditions" and "do not support a reasonable inference that the director defendants approved or disseminated the financial disclosures knowingly or in bad faith." *See Citigroup*, 964 A.2d at 134-35.[9] Second, access to "real-time market information and quarterly operations data" do not support an inference of scienter and cannot be differentiated from access to "internal reports" and "internal corporate documents" that has been found to be inadequate in other contexts.[10] *See Rattner v. Bidzos*, 2003 WL 2284323, at *10 n.53 (Del. Ch. 2003); *Sachs v. Sprague*, 401 F. Supp. 2d 159, 165 (D. Mass. 2005).[11]

---

687; *Wood*, 953 A.2d at 142.

[9] The complaint also alleges a "company specific" alleged red flag -- the SEC's 2006 warning letter to Mr. Gross, but fails to allege that the board of directors had actual knowledge of this warning letter. *In re Coca-Cola Enter. Inc. Derivative Litig.*, 478 F. Supp. 2d 1369, 1376 (N.D. Ga. 2007) (finding that a pleading was inadequatate because "it fail[ed] to provide facts demonstrating that any of the individual [d]efendants were involved or had any knowledge of the[] actions" at issue."); *In re Citigroup Inc. Shareholders Litig.*, 2003 WL 21384599, at *2 (Del. Ch. 2003) (finding directors had no notice of "red flag" because there was no allegation that the documents at issue were distributed to the board of directors).

[10] The complaint's allegations are distinct from those made in *Countrywide* that were found sufficient to allege scienter. The *Countrywide* complaint alleges a "corporate culture" that encouraged a knowing disregard and "widespread deviations" from Countrywide's internal policies and standards. *See Countrywide*, 554 F. Supp. 2d at 1082. No such allegation is made here.

[11] *Rattner* held that the allegations that the defendants had "access to the adverse undisclosed information about its business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared

15

In sum, Ms. Staehr's breach of loyalty claim fails because she fails to allege with particularity that the independent director defendants acted with scienter in alleged misrepresentations and omissions.

### IV. STATE LAW CLAIM FOR CORPORATE WASTE

Ms. Staehr alleges that the independent director defendants, along with Mr. Miller and Mr. Gross, face a substantial likelihood of liability for wasting corporate assets because they failed to consider the interests of Lennar when they authorized the repurchase of stock at artificially inflated prices for the purpose of sustaining the stock price. A claim for corporate waste under Delaware law requires the plaintiff to plead facts that overcome the principle of good faith by showing "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *See In re Citigroup Inc.*, 964 A.2d at 137. Where "there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste." *See Brehm,* 746 A.2d at 263. *Cf. In re Countrywide*, 554 F. Supp. 2d at 1078 (finding that there was reason to doubt that a stock repurchase plan was an exercise of valid business judgment because "a strong inference of scienter attache[d] to several" of the defendants). When directors, acting without scienter, authorize a stock repurchase at market price -- even if that price was artificially inflated -- there is no claim for corporate waste because "ordinary and rational businesspeople [ ] trading the stock" concluded that the stock was worth the market price. *See In re Citigroup Inc.*, 964 A.2d at 137. Ms. Staehr has not stated a claim for waste because she has not alleged with particularity that the defendants acted with scienter in authorizing the repurchase and because rational investors purchased Lennar stock at market price. *See id*.

### V. STATE LAW CLAIM FOR UNJUST ENRICHMENT

Ms. Staehr claims that the defendants were unjustly enriched under Delaware state law because they received compensation and benefits while they were breaching their fiduciary duties

---

thereto)" were not sufficiently particular to support a finding of scienter. *See Rattner*, 2003 WL 2284323, at *10 n.53. The "real-time market information," which includes details of sales, inventory levels, and credit market conditions, cannot be distinguished from the data found insufficient in *Rattner*.

to Lennar. "Unjust enrichment is defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *See Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (citations omitted). Because Ms. Staehr failed to adequately allege that the defendants breached their fiduciary duties, she fails to state a claim for unjust enrichment because this claim is premised on the defendants' breach.

### VI. WHETHER LEAVE TO AMEND THE COMPLAINT IS APPROPRIATE

Ms. Staehr seeks leave to amend her complaint on the grounds that leave to amend "shall be freely given when justice so requires." *See* Rule 15(a)(2). Amendment is not appropriate "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001), citing *Foman v. Davis*, 371 U.S. 178, 182 (1962). Ms. Staehr has had ample opportunity to state a claim against the defendants in her prior two complaints. Her repeated failure to cure the deficiencies, including the deficiencies in the first amended complaint identified in the December 10, 2008, hearing show that amendment is not appropriate and would be futile.

### VII. CONCLUSION

For the reasons stated above, the individual defendants' motion to dismiss [D.E. 80] and the nominal defendants' motion to dismiss [D.E. 81] are GRANTED. Ms. Staehr's claims are DISMISSED WITH PREJUDICE.

This case is CLOSED. Any and all pending motions are DENIED AS MOOT.

DONE and ORDERED in chambers in Miami, Florida, this 31st day of March, 2010.

*/s/ Adalberto Jordan*
Adalberto Jordan
United States District Judge

Copy to:     All counsel of record